# FORD MOTOR CO. *v.* UNITED STATES.

NO. 1.

Argued October 11, 1948.—Decided November 15, 1948.

304

*Charles E. Hughes, Jr.* argued the cause and was on a brief for appellants. *William T. Gossett, Clifford B. Longley, Frederick C. Nash* and *Wallace R. Middleton* were also on the briefs for appellant in No. 1, and *Samuel S. Isseks, Melbourne Bergerman, Seymour Kleinman* and *Alphonse A. Laporte* were also on the briefs for appellants in No. 2.

*Albert Holmes Baldridge* argued the cause for the United States. With him on the brief were *George T. Washington,* then Acting Solicitor General, *Assistant Attorney General Berge* and *James C. Wilson.*

*Russell Hardy* filed a brief for the Associates Investment Co. et al., as *amici curiae,* urging affirmance.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

These cases were brought here on appeal, prior to the revision of Title 28, United States Code, under what was § 345 and since September 1 has become § 2101 of that Title, to review final decrees of the United States District Court for the Northern District of Indiana in a suit in equity brought by the United States under § 4 of the Sherman Law, 26 Stat. 209, as amended, 36 Stat. 1167, 15 U. S. C. § 4. The cases present another phase of a multifarious litigation which has been occupying the attention of the federal judicial system for more than a decade. *United States* v. *General Motors Corp.,* 26 F. Supp. 353 (N. D. Ind.); *United States* v. *General Motors Corp.,* 121 F. 2d 376 (C. A. 7th Cir.), cert. denied, 314 U. S. 618, rehearing denied, 314 U. S. 710; *United States* v. *General Motors Corp.,* 2 F. R. D. 346 (N. D. Ill.); *United States* v. *General Motors Corp.,* 2 F. R. D. 528 (N. D. Ill.); *Chrysler Corp.* v. *United States,* 314 U. S. 583,

rehearing denied, 314 U. S. 716; *Chrysler Corp.* v. *United States,* 316 U. S. 556. An analytical summary of this litigation will make clear the immediate issues before us and, indeed, largely dispose of them.

On May 27, 1938, indictments were returned in the District Court of the United States for the Northern District of Indiana, South Bend Division, against the three leading automobile manufacturers and the companies which financed the sale of their automobiles. One indictment was against the present appellants, Ford Motor Company, and Commercial Investment Trust Corporation, Commercial Investment Trust, Inc., and Universal Credit Corporation, these three referred to collectively as CIT; another against Chrysler Corporation and Commercial Credit Company; a third against General Motors Corporation and its subsidiary, General Motors Acceptance Corporation, to be abbreviated as GMAC. The indictments charged the automobile manufacturers and the jointly named finance companies with violations of the Sherman Law by influencing dealers who sold the automobiles of the respective manufacturers to give the finance companies the business of financing the dealers' wholesale purchases and retail sales of automobiles.

Following these charges, negotiations were set afoot to secure the elimination through consent decrees of the practices described in the indictments. As to the Ford and Chrysler groups, the Government, on November 7, 1938, filed suits in equity and arranged for the dismissal of their indictments. (For present purposes we are not further concerned with Chrysler.) Although Ford and CIT formally resisted the complaint, denying its allegations and pleading affirmative defenses, negotiations for a consent decree proceeded. Efforts toward an amicable settlement with General Motors and GMAC failed. The Government therefore pressed the criminal charges against them. In view of the competitive conditions in

the automobile industry it obviously became of crucial importance to Ford not to consent to any restraints beyond those which would fall upon General Motors through the contingencies of litigation against it. But it would not have been enough merely to provide that restraints which Ford accepted should eventually be lifted to the extent not imposed upon General Motors at some remote time defined merely by the vicissitudes of litigation. Protection against competitive disadvantage, the appropriateness of which the Government recognized, required a time certain at the end of which the restraints against Ford would expire if General Motors were still free of them.

Accordingly, the consent decree, entered on November 15, 1938, assured Ford essential equality of position with the unconsenting General Motors by two explicit conditions. Their terms are fully set out in the margin; [1]

---

[1] "12. The Respondent Finance Company shall not pay to any automobile manufacturing company and the Manufacturer shall not obtain from any finance company any money or other thing of value as a bonus or commission on account of retail time sales paper acquired by the finance company from dealers of the Manufacturer. The Manufacturer shall not make any loan to or purchase the securities of Respondent Finance Company or any other finance company, and if it shall pay any money to Respondent Finance Company or any other finance company with the purpose or effect of inducing or enabling such finance company to offer to the dealers of the Manufacturer a lower finance charge than it would offer in the absence of such payment, it shall offer in writing to make, and if such offer is accepted it shall make, payment upon substantially similar bases, terms and conditions to every other finance company offering such lower finance charge; provided, however, that nothing in this paragraph contained shall be construed to prohibit the Manufacturer from acquiring notes, bonds, commercial paper, or other evidence of indebtedness of Respondent Finance Company or any other finance company in the open market.

"It is an express condition of this decree that notwithstanding the provisions of the preceding paragraph of this paragraph 12 and

their essence can be briefly summarized. Paragraph 12 forbids Ford from acquiring control of any finance company. After enumerating various forbidden forms of financial interest, the paragraph provides that, if the Gov-

of any other provisions of this decree, if an effective final order or decree not subject to further review shall not have been entered on or before January 1, 1941, requiring General Motors Corporation permanently to divest itself of all ownership and control of General Motors Acceptance Corporation and of all interest therein, then and in that event, nothing in this decree shall preclude the Manufacturer from acquiring and retaining ownership of and/or control over or interest in any finance company, or from dealing with such finance company and with the dealers in the manner provided in this decree or in any order of modification or suspension thereof entered pursuant to paragraph 12a. The court, upon application of the respondents or any of them, will enter an order or decree to that effect at the foot of this decree, and the right of any respondent herein to make the application and to obtain such order or decree is expressly conceded and granted.

"12a. It is a further express condition of this decree that:

"(1) If the proceeding now pending in this court against General Motors Corporation instituted by the filing of an indictment by the Grand Jury on May 27, 1938, No. 1039, or any further proceeding initiated by reindictment of General Motors Corporation for the same alleged acts, is finally terminated in any manner or with any result except by a judgment of conviction against General Motors Corporation and General Motors Acceptance Corporation therein, then and in that event every provision of this decree except those contained in this sub-paragraph (1) of this paragraph 12a of this decree, shall forthwith become inoperative and be suspended, until such time as restraints and requirements in terms substantially identical with those imposed herein shall be imposed upon General Motors Corporation and General Motors Acceptance Corporation and their subsidiaries either (a) by consent decree, or (b) by final decree of a court of competent jurisdiction not subject to further review, or (c) by decree of such court which although subject to further review continues effective. The court reserves jurisdiction upon application of any party to enter orders at the foot of this decree in accordance with the provisions of this paragraph.

"(2) A general verdict of guilty returned against General Motors Corporation in said proceeding, followed by the entry of judgment

ernment should not have obtained a final decree against General Motors by January 1, 1941, requiring it to divest itself of all interest in GMAC, its affiliated finance company, the prohibition against Ford would cease. The

thereon, shall be deemed to be a determination of the illegality of any agreement, act or practice of General Motors Corporation which is held by the trial court, in its instructions to the jury, to constitute a proper basis for the return of a general verdict of guilty. A special verdict of guilty returned against General Motors Corporation in said proceeding, followed by the entry of judgment thereon, shall be deemed to constitute a determination of the illegality of any agreement, act or practice of General Motors Corporation which is the subject of such special verdict of guilty. A plea of guilty or nolo contendere by General Motors Corporation, followed by the entry of judgment of conviction thereon, shall be deemed to be a determination of the illegality of any agreement, act or practice which is the subject matter of such plea. The determination, in the manner provided in this clause, of the illegality of any agreement, act or practice of General Motors Corporation shall (for the purposes of clause (3) of this paragraph) be considered as the equivalent of a decree restraining the performance by General Motors Corporation of such agreement, act or practice, unless or until such judgment is reversed, or unless such determination is based, in whole or in part, (a) upon the ownership by General Motors Corporation of General Motors Acceptance Corporation, or (b) upon the performance by General Motors Corporation of such agreement, act or practice in combination with some other agreement, act or practice with which the respondents are not charged in the indictment heretofore filed against them by the Grand Jury on May 27, 1938, No. 1041;

"(3) After the entry of a consent decree against General Motors Corporation, or after the entry of a litigated decree, not subject to further review, against General Motors Corporation by a court of the United States of competent jurisdiction, or after the entry of a judgment of conviction against General Motors Corporation in the proceeding hereinbefore referred to, or after January 1, 1940 (whichever date is earliest), the court upon application of any respondent from time to time will enter orders:

"(i) suspending each of the restraints and requirements contained in sub-paragraphs (d) to (f) and (h) to (l), inclusive, of paragraph 6 of this decree to the extent that it is not then imposed, and until

second express condition, designed to relieve from restraints imposed by earlier paragraphs in the decree against various means of influencing dealers to patronize CIT, is found in paragraph 12a. That paragraph addressed itself to the possible eventualities of the criminal proceeding against General Motors and GMAC: (1) its termination with a result other than a judgment of conviction; (2) a general verdict of guilty; (3) a special verdict of guilty; (4) a plea of guilty or nolo contendere. Upon the first contingency all restrictive terms of the de-

it shall be imposed, in substantially identical terms, upon General Motors Corporation and its subsidiaries, and suspending each of the restraints and requirements contained in sub-paragraphs (a), (c) and (d) of paragraph 7 of this decree to the extent that it is not imposed and until it shall be imposed in substantially identical terms, upon General Motors Acceptance Corporation and its subsidiaries, either (w) by consent decree, or (x) by final decree of a court of competent jurisdiction not subject to further review, or (y) by decree of such court which, although subject to further review, continues effective, or (z) by the equivalent of such a decree as defined in clause (2) of this paragraph; provided, however, that if the provisions of a consent or litigated decree against General Motors Corporation and its subsidiaries corresponding to sub-paragraphs (j) and (k) of paragraph 6 of this decree are different from said sub-paragraphs of this decree, then upon application of the respondents any provision or provisions of said sub-paragraphs will be modified so as to conform to the corresponding provisions of such General Motors Corporation decree;

"(ii) suspending each of the restraints and requirements contained in the remaining sub-paragraphs (a), (b), (c) and (g) of paragraph 6 to the extent that it is not then imposed, and until it shall be imposed, upon General Motors Corporation and its subsidiaries in any manner specified in the foregoing sub-clause (i) of clause (3), if any respondent shall show to the satisfaction of the court that General Motors Corporation or its subsidiaries is performing any agreement, act or practice prohibited to the Manufacturer by said remaining sub-paragraphs, and suspending each of the restraints and requirements contained in sub-paragraph (b) of paragraph 7 of this decree to the extent that it is not imposed, and until it shall be imposed, upon General Motors Acceptance Corporation and its sub-

cree against Ford would be suspended until similar restraints were imposed upon General Motors and GMAC. The second was to be "deemed to be a determination of the illegality of any agreement, act or practice of General Motors Corporation which is held by the trial court, in its instructions to the jury, to constitute a proper basis for the return of a general verdict of guilty." The third and fourth were, respectively, to be deemed determinations of the illegality of "any agreement, act or practice" which was their subject matter.

---

sidiaries in any said manner, if any respondent shall show to the satisfaction of the court that General Motors Acceptance Corporation is performing ,any agreement, act or practice prohibited to Respondent Finance Company by said sub-paragraph (b) of paragraph 7;

"(iii) Suspending the restraints of sub-paragraph (d) of paragraph 7 of this decree as to Respondent Finance Company, in the event that the restraints of sub-paragraph (i) of paragraph 6 of this decree are suspended as to the Manufacturer.

"(4) The right of the respondents or any of them to make any application for suspension of any provision of this decree in accordance with the provisions of this paragraph and to obtain such relief is hereby expressly granted.

"In the event that at any time prior to the date when General Motors Corporation has permanently divested itself of all ownership and control of and interest in General Motors Acceptance Corporation, General Motors Acceptance Corporation shall make available to dealers of General Motors Corporation in any area a finance charge, on all or any class of automobiles sold by dealers of General Motors Corporation, less than the finance charge then generally available to dealers of the Manufacturer within such area, nothing in this decree shall prevent the Manufacturer from making, and the Manufacturer may make, adjustments, allowances or payments to or with all of its dealers in such area who agree to reduce to an amount approved by the Manufacturer (but not less than that then made available by General Motors Acceptance Corporation) the finance charges which such dealers of the Manufacturer in such area receive from any class of retail purchasers of automobiles, provided that such adjustments, allowances or payments shall not discriminate among such dealers in such area."

These provisions furnish a litmus-paper test for determining what restraints survive the result of the proceeding against General Motors and GMAC. What was not illegal for General Motors was not longer to be prohibited to Ford. The sword of justice was to strike both alike. Paragraph 12a further defines how and when the restraints were to be relaxed. Sub-paragraph (3) provides that after the entry of a decree against General Motors, or after the entry of a judgment of conviction in the pending criminal proceedings "or after January 1, 1940 (whichever date is earliest), the court upon application of any respondent from time to time will enter orders" suspending any restraint against it (with exceptions not now relevant) "to the extent that it is not then imposed, and until it shall be imposed, in substantially identical terms" upon General Motors or GMAC.

On November 17, 1939, the jury returned a general verdict of guilty against General Motors, the Court of Appeals for the Seventh Circuit affirmed the judgment upon that verdict, 121 F. 2d 376, and this Court denied further review. 314 U. S. 618; id. at 710.

On October 4, 1940, the Government finally brought a suit in equity against General Motors seeking divestiture of its control of GMAC. But it was then too late for a decree to be entered before the lapse of Ford's agreement not to become affiliated with a finance company. On December 21, 1940, therefore, the Government made a motion asking to have paragraph 12 modified by moving forward the date when the prohibition against affiliation would expire if a decree against General Motors had not then been entered. Each year after that, as the new deadline came near, the Government made a new motion to have it extended, and year after year Ford consented to the extension. On December 31, 1945, the Government again moved to have the prohibition against

affiliation extended, this time to January 1, 1947. Ford
now resisted the motion, and on May 4, 1946, both Ford
and CIT filed motions of their own. They asked the
District Court to suspend sub-paragraphs (i) and (k) of
paragraph 6 and sub-paragraph (d) of paragraph 7 and to
modify sub-paragraph (e) of paragraph 6 on the ground
that the practices enjoined by these provisions of the de-
cree were not "held by the trial court, in its instructions
to the jury, to constitute a proper basis for the return of a
general verdict of guilty." Ford also moved that "an
order be entered pursuant to paragraph 12 . . . that noth-
ing therein shall preclude the Manufacturer from acquir-
ing and retaining ownership of and/or control over or
interest in any finance company . . . ." The District
Court denied the motions by Ford and CIT and granted
the Government's motion for extension of the prohibition
against affiliation to January 1, 1947. The present ap-
peals followed. Although the particular extension of
paragraph 12 appealed from has expired, the equity suit
against General Motors has not yet been set down for trial
and the Government's motion for a further extension has
been held in abeyance pending the outcome of these ap-
peals. It is not a moot question therefore whether the
District Court properly granted the extension to January
1, 1947. See *Southern Pacific Co.* v. *Interstate Commerce
Commission,* 219 U. S. 433, 452; *Southern Pacific Termi-
nal Co.* v. *Interstate Commerce ·Commission,* 219 U. S.
498, 514–16.

The restraints imposed against Ford by sub-paragraphs
6 (e), 6 (i), 6 (k) and 7 (d) must survive the outcome of
the conviction against General Motors if the language
of the trial judge's charge to the jury in the criminal prose-
cution of General Motors can fairly be equated with the
language of those sub-paragraphs. If, on the other hand,
the judge's charge falls short of holding illegal what those

sub-paragraphs proscribed, appellants are entitled to a suspension of sub-paragraphs 6 (i), 6 (k) and 6 (d) and a modification of sub-paragraph 6 (e).

First, then, to summarize the contents of these provisions of the decree.[2] Sub-paragraph 6 (i) precludes

[2] Their full text is as follows:

"[6.] (e) Except as provided by sub-paragraphs (j) and (k) of this paragraph 6,

"(i) the Manufacturer shall not establish any practice, procedure or plan for the retail or wholesale financing of automobiles for the purpose of enabling Respondent Finance Company or any other finance company or companies to enjoy a competitive advantage in obtaining the patronage of dealers through any service, facility or privilege extended by the Manufacturer pursuant to such practice, procedure or plan if such service, facility or privilege or a service, facility or privilege corresponding thereto, is not made available upon its written request to any other finance company upon substantially similar terms and conditions; and

"(ii) so long as the Manufacturer shall continue to afford any service, facility or privilege not otherwise specifically referred to in this decree to Respondent Finance Company or any other finance company or companies, it shall not refuse to afford similar or corresponding services, facilities or privileges upon substantially similar terms and conditions and upon written request to any other finance company for the purpose of giving Respondent Finance Company or any other finance company or companies a competitive advantage in obtaining the patronage of dealers; provided that it shall not be a violation of this decree for the Manufacturer to afford such service, facility or privilege only to registered finance companies as defined in sub-paragraph (j) of this paragraph 6 or only to a finance company designated in writing to the Manufacturer by the dealer or prospective dealer;

"the written request shall specify in each instance the particular service, facility or privilege desired;

.            .            .            .            .

"[6.] (i) The Manufacturer shall not, except in each instance upon written request of the dealer or prospective dealer, arrange or agree with Respondent Finance Company or any other finance company that an agent of the Manufacturer and an agent of the finance company shall together be present with any dealer or prospective dealer

Ford from arranging with CIT or any other finance company "that an agent of the Manufacturer and an agent of the finance company shall together be present with any dealer or prospective dealer for the purpose of influencing the dealer to patronize" the finance company.   Sub-para-

for the purpose of influencing the dealer to patronize Respondent Finance Company or such other finance company; provided, however, that it shall not be a violation of this decree for the Manufacturer to assist any dealer or prospective dealer, because of said dealer's or prospective dealer's financial situation or requirements, by joint conference with him and a representative of a particular finance company, to obtain special facilities or services (such term not including only the financing of the shipment or delivery of automobiles to such dealer or prospective dealer and/or only the purchase or acquisition of retail time sales paper from him in the regular course of business) from the particular finance company and, in part consideration of such special facilities or services, for such dealer or prospective dealer to arrange to do business with such finance company on an exclusive basis for a reasonable period of time as may be agreed between them;

.            .            .            .            .

"[6.] (k) The Manufacturer shall not recommend, endorse or advertise the Respondent Finance Company or any other finance company or companies to any dealer or to the public; provided, however, that nothing in this decree contained shall prevent the Manufacturer in good faith:

"(1) From adopting from time to time a plan or plans of financing retail sales of new automobiles made by the Manufacturer or from time to time withdrawing or modifying the same;

"(2) From recommending to its dealers the use of such plans;

"(3) From advertising to the public and recommending the use of such plans.

.            .            .            .            .

"7. The Respondent Finance Company:

.            .            .            .            .

"(d) Shall not, except upon written request of the dealer or prospective dealer, arrange or agree with the Manufacturer that an agent of the Manufacturer and an agent of Respondent Finance Company shall together be present with any dealer or prospective dealer for the purpose of influencing the dealer or prospective dealer

graph 6 (k) provides that "the Manufacturer shall not recommend, endorse or advertise the Respondent Finance Company or any other finance company or companies to any dealer or to the public . . . ." Sub-paragraph 7 (d), the counterpart of 6 (i), is directed against CIT. Sub-paragraph 6 (e) restrains Ford from establishing "any practice, procedure or plan for the retail or wholesale financing of automobiles for the purpose of enabling Respondent Finance Company or any other finance company or companies to enjoy a competitive advantage in obtaining the patronage of dealers" not equally available to any other finance company. Modification of this sub-paragraph is asked only to the extent necessary to permit them freedom to act in a manner otherwise permissible, if suspension of sub-paragraphs 6 (i), 6 (k) and 7 (d) is granted.

This brings us to the trial judge's instructions, which, insofar as relevant, are fully set forth below.[3] Their plain effect is to draw a line between such practices as cancellation of a dealer's contract, or refusal to renew it,

---

to patronize Respondent Finance Company; provided, however, that it shall not be a violation of this decree for Respondent Finance Company by joint conference with a dealer or prospective dealer and a representative of the Manufacturer to agree to furnish to such dealer or prospective dealer, because of his financial situation or requirements, special facilities or services (such term not including only the financing of the shipment or delivery of automobiles to such dealer or prospective dealer and/or only the purchase or acquisition of retail time sales paper from him in the regular course of business) and in part consideration of such special facilities or services to arrange for the dealer or prospective dealer to do business with Respondent Finance Company on an exclusive basis for such reasonable period of time as may be agreed between them."

[3] "It is not unreasonable for the General Motors Company to have a finance company. It is not unreasonable for the General Motors Company to have contracts with its dealers for a year or to have a cancellation clause in them. They have a perfect right to have a finance company and to recommend its use. They have

or discrimination in the shipment of automobiles, as a means of influencing dealers to use GMAC, all of which fall within the common understanding of "coercion," and other practices for which "persuasion," "exposition" or "argument" are fair characterizations. As a mere matter of interpreting language, the Government hardly challenges the fitness of the terms "persuasion," "ex-

a perfect right to cancel a contract from their dealer as long as they are not performing any unreasonable act.

"They have a right to determine whom they will sell their cars to, and they have a right to determine whom they will not sell their cars to because cars are their product and they are their property and no law compels them to sell them to any man they don't want to sell them to; but that is not the charge in this case. The charge is not that by having difficulty in contracts in itself, these defendants did anything wrong; it is not charged here that to recommend the use of GMAC there is anything wrong; it is not charged here that cancellation for cause is anything wrongful; but the Government's theory in this case is irrespective of these contracts and independent of them and outside of them the conditions have been asserted that they, under the designation of those to the grand jurors unknown, the actions have been such that the possibility, the ability to cancel, the ability to refuse to renew a contract, have been used as clubs upon the dealers to force them to use GMAC and that these acts that are complained of were acts that were used to force the dealers to use GMAC, the Government insists that these acts inspired by that motive have been such as to result in cancellations that otherwise would not have occurred; in discriminations that would not otherwise have occurred in the shipment of cars in interstate commerce and in refusals to renew that would not otherwise have occurred, and in the use of GMAC when it otherwise would not have been used.

"In other words, the Government has no right to complain, and it may not complain of the defendants' right to limit its sales of cars to persons whom it may select, its right to determine who it shall sell to, its rights to determine upon what terms it will sell, its right to pick its own dealers.

"It can only complain if the defendants do sufficient of these acts charged in the indictment as constitute duress upon the dealer to accomplish a result that would have otherwise not have been

position" or "argument," which the jury was charged were open to General Motors, to cover acts such as arranging for the presence of agents of both Ford and CIT with

---

accomplished, and to make a dealer do something that he would not have done of his own free will.

"That, almost, is the question in this case—whether the dealer could act as a free man; whether he could act of his own free will.

"The defendants say:

" 'We never imposed any restrictions upon that freedom of action.'

"The Government says it did and there is that question. If it did—if the defendants did that sort of thing—and if it resulted in an unreasonable restriction and unreasonable restraint of interstate commerce, then you would have a right to find them guilty.

"If they did not do it, this lawsuit is at an end, and that is a question which you have got to decide.

"You know, you have heard of the terms:

"Exposition;
"Persuasion;
"Argument;
"Coercion.

"They are different steps. They are graduated steps that I suppose every salesman goes through, except perhaps the last.

"In Exposition one may expound the merits of that which he has to sell; he may explain its nature and by his exposition make a clear picture of what he has.

"By persuasion he may endeavor to persuade the person to whom he is talking to accept that which he has to offer.

"There is little advancement in his further progress, to argue.

"Persuasion means something softer than argument, perhaps, but he may argue with him, and argue with him the respective merits of his product and other products being offered to the person to whom he makes his offer.

"All of these are proper.

"He may not go beyond that and use something that is within his power to use as a club to coerce the person to accept that which he has to offer.

.          .          .          .          .

"You must remember that, after all, this coercion, if you find that coercion exists, then the ultimate question is; Has that resulted in unreasonable restraint of interstate commerce? And that is a question for you to determine from all of the evidence."

a view to putting the claims of CIT to a dealer or recommending, endorsing, and advertising CIT to a dealer. But all these acts were specifically forbidden Ford by the consent decree. The Government's insistence is that since the indictment charged that advertising, endorsement and recommendation violated the Sherman Law and since evidence was introduced to support the charge, the jury might have found General Motors and GMAC guilty of "coercion" at least partly on the basis of that evidence. But sub-paragraph 12 (a) (2) was not designed to authorize speculative reconstruction of the jury's process in reaching its verdict. It provided a definite standard for ascertaining what rules of law were at a future date to be made binding on a competitor of Ford. The rules which the trial judge formulated against General Motors were thereafter to be the rules of law against Ford. The trial judge used the word "coercion" to summarize practices which, if the jury found them to exist, would call for a verdict against General Motors. He used the words "persuasion," "exposition" and "argument" to describe conduct which, in common usage, is not "coercion" and therefore would not support such a verdict. Nothing in other portions of the judge's charge erases or blurs this line of distinction. The restraints imposed by the paragraphs appellants seek to have suspended are properly described by the terms "exposition," "persuasion" and "argument." So long as these paragraphs remain in effect and so long as there is no comparable decree enjoining their substance against General Motors and GMAC, Ford and CIT cannot do without risk of violating the consent decree that which General Motors and GMAC are free to do. Only a lawyer who is obtuse or reckless would advise Ford and CIT that they could subject a dealer to "persuasion," "exposition" or "argument" without the hazard of contempt of the paragraphs under discussion. Thus the conditions have been fulfilled which entitled

Ford and CIT to suspension of the restraints imposed by those terms of the decree.

Quite apart from Ford's and CIT's consent to forego the opportunities outlawed by sub-paragraphs 6 (e), (i), (k) and 7 (d), the Government urges that a court of equity should refuse to suspend or modify them by claiming that the practices restrained by those paragraphs are in any event illegal under the Sherman Law. But since this has neither been admitted nor proven, and since ascertainment of illegality under the Sherman Law normally depends on the circumstances of a particular situation and the inferences they yield, the appellants have a right to insist that, so long as interdiction of these practices has not been decreed against General Motors, the Government be put to its proof. The lifting of the restraints imposed by the consent decree does not, of course, affect the liability of Ford for any violations of the Sherman Law that the Government may establish in court. Moreover, to the extent that such restraints may at some future date be imposed on General Motors, they will, by sub-paragraph 12a (3), equally fetter Ford.

There remains for consideration the question whether the District Court properly extended the prohibition against affiliation between Ford and a finance company. This was the sixth time that the Government had applied for extension. The equity suit begun more than six years earlier had not yet been brought to trial. The court was faced at the same time with a motion for suspension of the prohibition against affiliation which was made by appellants under the express provision of paragraph 12 reserving the right to such a motion. The court denied the appellant's motion and granted the Government's on the ground, (1) that the "time clause" of paragraph 12 was subsidiary to the "main purpose" of paragraph 12 which was "to provide that the test of the permanency of

the bar against affiliation was to abide the outcome of the civil antitrust suit against General Motors Corporation," and (2) "That the purpose and intent of the decree will be carried out if Ford Motor Company is given the opportunity at any future time to propose a plan for the acquisition of a finance company, and to make a showing that such plan is necessary to prevent Ford Motor Company from being placed at a competitive disadvantage . . . ."

The Government seeks to support these conclusions by insisting on a mechanical application of the decision in *Chrysler Corp.* v. *United States,* 316 U. S. 556, involving a parallel prohibition against Chrysler. The *Chrysler* case was decided on June 1, 1942. In the intervening years the factors of the problem have drastically changed. More than nine years have elapsed since the criminal prosecution against General Motors was concluded; what was at the time of the *Chrysler* decision a two-year delay in obtaining a civil decree against General Motors has now stretched into a ten-year delay. Even then, six and a half years ago, this Court characterized the District Court's finding that the Government had proceeded "diligently and expeditiously" as "markedly generous." 316 U. S. at 563. At that time the Court also found support for the District Court in the fact that "the complete cessation of the manufacture of new automobiles and light trucks has drastically minimized the significance of the competitive factor." *Id.* at 564. But circumstances that were found extenuating on behalf of the Government two years after the entry of the decree are hardly compelling ten years afterward. While a showing that continuance of the bar against affiliation would cause competitive disadvantage may not, as a practical matter, unreasonably have been called for at a time when competition in the industry was completely

suspended during the indeterminate period of war, the resumption of full-scale competition makes such a showing unnecessary. And this is unaffected by the fact that automobiles are still in short supply. The appellants agreed for a limited term to refrain from pursuing conduct which, in the absence of an adjudication that it was illegal, they were otherwise free to pursue and which General Motors has always been free to pursue. There has been no such adjudication and successive extensions of the term have expired. The crucial fact now is not the degree of actual disadvantage but the persistence of an inequality against which the appellants had secured the Government's protection. Yet the Government seeks a change in the express terms of the decree which would perpetuate that inequality. The Government has not sustained the burden of showing good cause why a court of equity should grant relief from an undertaking well understood and carefully formulated. If the Government seeks to outlaw possible arrangements by Ford with a finance corporation, it must establish its case in court against Ford as against General Motors and not draw on a consent which by its very terms is not available.

The judgment is reversed and the cause remanded for proceedings not inconsistent with this opinion.

*Reversed.*

Mr. Justice Murphy and Mr. Justice Jackson took no part in the consideration or decision of these cases.

Mr. Justice Black, dissenting.

The Court appears to accept the argument of appellants that this consent decree must be treated as though it were a contract between private persons for purchase of an automobile. But a consent decree is not a contract. A consent decree in an antitrust proceeding like a decree

entered after a contest must be treated as a judicial determination and order made in the public interest. *United States* v. *Swift & Co.,* 286 U. S. 106, 114–115. That means, I would suppose, that before the restraints in this decree are lifted, a showing should be made that such action would not tend to generate future violations of the antitrust laws. No such showing has been made here. As I see the case, modification of the decree under the circumstances shown will aid and encourage destruction of competition contrary to law. For so far as existing effective court restraints are concerned, modification will give Ford freedom to help the appellant finance companies crush their competitors.

Even though Ford and Commercial Investment Trust Corporation (C. I. T.) made no admission of the facts charged in the original complaint, the undenied allegations of the bill were sufficient to support the decree's prohibition against future competition-destroying practices. *Swift & Co.* v. *United States,* 276 U. S. 311, 327. In very brief summary, those facts, so far as relevant to the view I take, are these:

At the time the decrees were entered, Ford made and sold about 25% of all cars in the United States, Chrysler 25% and General Motors 44%. Ford and the others sell to dealers about four billion dollars' worth of cars yearly, requiring cash on delivery. The dealers then sell to retail customers. About 60% of the retail sales are on credit. Dealers not permitted to sell other makes of cars are wholly dependent upon Ford's, G. M.'s or Chrysler's favorable treatment for their business lives. The dealer agencies are for one year, but the agency contracts can be canceled on short notice and without cause. The dealers are thus economic dependents of the company whose cars they sell. While there are about 375 independent finance companies, C. I. T. and its subsidiaries, appellants here,

prior to entry of this court decree, furnished about 82% of the money for Ford dealer purchases, and 70% of that furnished for Ford retail purchases. The favored companies got this major percentage of Ford car loans because Ford supplied them with offices at its factories, kept them informed of sales, gave more liberal payment terms to its dealers who dealt with C. I. T., required dealers to keep their books and records open so that Ford could prevent transactions with other finance companies, sent Ford factory representatives with C. I. T. agents to help "persuade" dealers to do business with C. I. T., and required dealers who handled loans through others to make satisfactory explanations to Ford.

This Ford favored finance company, C. I. T., asks modification. One reason suggested for modification is that the C. I. T. group has lost a portion of Ford financing since the decree subjected them to competition with other finance companies. They complain of the decree not because it stifles competitive practice; quite the contrary, they complain because the decree infringes on C. I. T.'s monopolistic sanctuary.

In substance, the modifications requested are, (1) that Ford be permitted to acquire ownership, control, or an interest in a finance company; (2) that Ford be permitted to endorse, recommend, or advertise particular finance companies to its dealers; (3) that Ford be permitted to arrange with finance companies that its representatives go with agents of the favored company to dealers to "influence" those dealers to negotiate loans for themselves and retail purchasers only with the favored companies. Freedom to influence dealers would appear to offer a perfect opportunity for Ford and the favored finance companies to deprive Ford dealers and retail purchasers of all benefits in the way of low interest rates and liberal loan terms the dealers and retailers might otherwise

obtain from competition among the hundreds of finance companies in the country. For it is sure, if the undenied allegations of the complaint be accepted, as they should be at this stage, that the economic power of Ford over its dealers is so great that dealers who desperately need Ford cars will be helpless to resist Ford's "influence" and "persuasion," whether legalistically called "coercion" or not. Due to Ford's power, what dealer could afford to draw nice distinctions between "persuasion" and "coercion"? I can hardly believe that the showing of an agreement between Ford and C. I. T. to return to their old methods of "persuasion" would fail to support a finding of unreasonable restraint of trade.

It must be remembered that Ford neither promised, nor is it required by this court's action, to refrain from using its overpowering influence to "persuade" its dealers in the same old way. Ford and C. I. T. rely here on no showing of an intent to abide by the antitrust law; they rely on the literal language of what they treat as a contract with government prosecutors. But government officers have no power, by contract or otherwise, to permit violations of the law, even should they attempt to do so, which in this case I do not think they did. Had General Motors been acquitted on the criminal charge of violating the antitrust laws, there would be merit in the contention of Ford that government officers should not insist on continuance of this injunction against Ford. General Motors was not acquitted, but was convicted under an indictment alleging the same type of economic pressure practices enjoined by this consent decree. And the trial judge charged the jury that they had "a right to find these Defendants guilty" if they found that the Government had "proved the acts beyond all reasonable doubt that are averred in this indictment." True the court charged the jury that acts of mere "persuasion" were not enough, and

that General Motors must have used its power "as a club to coerce." And the court explained dictionary differences in the abstract between "persuasion" and "coercion." But the jury was considering a concrete set of facts in which the language used by General Motors, in the abstract, might only amount to "persuasion," while the language plus General Motors' economic power might amount to "coercion." And the jury's verdict of guilty, viewed in the light of the court's charge, means to me that the persuasion plus economic power charged and proved in the *General Motors* case, which were in substance the identical acts and practices charged and enjoined in this case, showed use of "a club to coerce" in violation of the antitrust laws. I therefore agree with the finding of the District Court here in denying Ford's motion to modify, namely that the agreements, acts, and practices such as here enjoined constituted a proper basis for the general verdict of guilty in the *General Motors* case. Consequently, I think that the Government has fairly met the consent decree's condition with reference to the conviction of General Motors.

Nor do I believe that in the present state of the record this Court should lift the ban against Ford's acquisition of or affiliation with a finance company. The law prohibits acquisition by one corporation of the whole or any part of the stock of "another corporation . . . where the effect of such acquisition may be . . . to restrain . . . commerce in any section or community, or tend to create a monopoly of any line of commerce." 38 Stat. 731–732, 15 U. S. C. § 18. There can be no doubt that affiliation between Ford and a certain group of finance companies will lessen the opportunity of other finance companies to compete for the automobile loan contracts both of dealers and retail purchasers. And where the volume of business as here involves 25% of all automobile sales

(and eventually probably in excess of 90%) the tendency to monopoly is aggravated.

Ford relies upon allegations made in its motion to modify to the effect that it will be competitively injured if denied an opportunity to affiliate with a finance company and to "persuade" its dealers to borrow from that company alone, so long as General Motors is allowed to "persuade" its dealers to borrow from a General Motors affiliate or subsidiary. But Ford has not proposed to the Court any legally allowable plan for affiliation, nor has it shown the Court that continuance of the decree will cause it to suffer a competitive disadvantage in the sale of cars. Failure of proof in these two respects was held an adequate ground for denying a motion of Chrysler Corporation to amend a decree precisely like this one. *Chrysler Corp.* v. *United States,* 316 U. S. 556, 564. We should take the same action in this case where the District Court specifically has found that Ford had failed to prove that continuance of the decree would subject Ford to a competitive disadvantage. Moreover, it is difficult to imagine how Ford could be suffering a competitive disadvantage in the sale of cars in today's famished car market. So far as this record shows, Ford would not lose the sale of a single car by leaving this decree as it is. And Ford does not rely on a desire to make a profit, secret or open, out of loans its dealers must obtain to pay Ford or loans retail purchasers must get to pay dealers. If Ford professed a desire to make loans as a finance company in open competition with other finance companies, that would be one thing. It is quite another to ask a court of equity to lift its ban in order that Ford may dictate loan terms for dealers and retail purchasers after Ford has sold the cars in the market. The only competitive disadvantage that this record reveals is that from which Ford dealers, Ford retail purchasers, and independent

loan agencies will suffer when the modification of this decree gives Ford and C. I. T. the green light.

Furthermore, the Court's action here means that the *Chrysler* decree must be modified without the showing this Court required in the *Chrysler* case. And it means that future destruction of competition in automobile financing by Ford, Chrysler, and General Motors has the tacit approval of this Court. For if Ford should after today "affiliate" with C. I. T., or renew its "persuasion" of dealers, could it be expected that this Court would thereafter hold these other companies legally responsible, even if it should be thought that today's permitted conduct ran afoul of the antitrust law? Is it conceivable that if Ford now "affiliates" with C. I. T., Ford's "vested interest," acquired with this Court's tacit approval, would be taken from Ford by a federal court?

Much talk about refined distinctions in the court's charge in the *General Motors* case cannot create doubts as to the effect of the decision today. The result will be destruction of competition in automobile financing. Hereafter dealers and retail purchasers cannot depend on competition to keep interest rates at a fair level. Their sole hope for low interest rates and loans on liberal terms will be the spontaneous generosity of Ford, General Motors, and Chrysler. It may be that monopoly in automobile loans is a good thing, but the antitrust laws assume that competition is better.

I would affirm this judgment.

MR. JUSTICE RUTLEDGE concurs in this dissent.

MR. JUSTICE DOUGLAS joins in this opinion insofar as it protests against lifting the ban on Ford's acquisition of or affiliation with a finance company.