UNITED STATES of America,
Plaintiff-Appellant,

v.

MOTOR VEHICLE MANUFACTURERS ASSOCIATION OF the UNITED STATES, INC. et al., Defendant-Appellees.

No. 79–3565.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 11, 1980.

Decided April 23, 1981.

Robert B. Nicholson, Washington, D.C., for plaintiff-appellant.

John H. Pickering, Washington, D.C., argued for defendants-appellees; James M. MacNee, III, Dearborn, Mich., Carl J. Shuck, Overton, Lyman & Prince, Los Angeles, Cal., Paul A. Heinen, Otis M. Smith, Detroit, Mich., Forest A. Hainline, Jr., Southfield, Mich., John H. Pickering, Wilmer, Cutler & Pickering, Washington, D.C., William H. Crabtree, Detroit, Mich., Marcus Mattson, Lawler, Felix, Hall, Los Angeles, Cal., on brief.

Before ANDERSON, ALARCON, and POOLE, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

The United States appeals from the denial of its motion to extend by ten years the effect of two provisions of a consent judgment entered by the district court on October 29, 1969. The court initially granted the government's motion to extend, but reversed itself after hearing the defendants' motion to reconsider. We reverse and remand for further findings.

## I. *BACKGROUND*

In January 1969, the Antitrust Division of the Justice Department filed a complaint in federal district court naming the Automobile Manufacturers Association, Inc. (now the Motor Vehicle Manufacturers Association of the United States, Inc.), and its component members, General Motors Corporation, Ford Motor Company, Chrysler Corporation, and American Motors Corporation, as defendants. The complaint charged that the Association, its members, and various co-conspirators not named as defendants had engaged in a combination and conspiracy to restrain competition in the development, manufacture, and installation of motor vehicle air pollution control equipment, in violation of Section One of the Sherman Act, 15 U.S.C. § 1.

In order to understand the litigation in its present phase, it is necessary to grasp in detail the nature of the conspiracy which the government was alleging in 1969. According to the complaint, the defendants, at least as early as 1953, had engaged in a combination whose dual objects were the elimination of all competition in the research, development, manufacture, and installation of air pollution control equipment and the elimination of competition in the purchase of patents and patent rights from other parties covering air pollution control equipment. Among the specific acts in furtherance of the alleged conspiracy charged in the complaint were:

(a) a general agreement that all air pollution control equipment development would be undertaken on a noncompetitive basis;

(b) an agreement to seek joint appraisal of patents and patent rights submitted to any of the defendants by persons not parties to a cross-licensing agreement entered into by the defendants on July 1, 1955, and to require "most-favored-purchaser" treatment of all parties to the cross-licensing agreement if any one were licensed by a person not a party to that agreement;

(c) an agreement to install air pollution control equipment only upon a uniform date determined by agreement, and three subsequent agreements to delay the installation date; and

(d) an agreement to restrict publicity relating to research and development efforts concerning the motor vehicle air pollution problem.

In its prayer for relief, the government sought a declaration that the defendants had engaged in a combination and conspiracy in restraint of trade, a general injunction against the maintaining of that conspiracy, and specific injunctive relief against certain of the agreements alleged in the complaint, and an injunction requiring that the defendants issue to any applicant interested in developing motor vehicle air pollution technology royalty-free licenses under all patents owned, controlled or applied for to which the 1955 cross-licensing agreement had been applicable.

After rather extensive negotiations, the Association and its members reached a settlement with the United States which was memorialized in a consent judgment entered by the district court on October 29, 1969. The judgment granted essentially all of the relief which the government had sought, with minor modifications which have no bearing on the issues involved in this appeal. The judgment also contained two provisions which occupy our immediate attention. Paragraph IV(A)(2)(a) enjoined the defendants from entering into any agreement "to exchange restricted information." The term "restricted information" was defined elsewhere in the judgment to include "trade secrets, unpublished compa-

ny policy, and other unpublished technical information" relating to pollution control devices.[1] The second pertinent provision appeared in Paragraph IV(A)(2)(g) wherein the defendants were enjoined from filing with any governmental regulatory agency authorized to issue emission standards or regulations any jointly-authored statement regarding such standards or regulations.[2] Under the terms of Paragraph IX of the judgment, both Paragraphs IV(A)(2)(a) and IV(A)(2)(g) were to expire ten years after the date of entry, provided that the government could "apply" to the district court for a continuation of either or both of the provisions not later than nine years after entry. The remainder of the provisions are permanently in force.

The preamble to the judgment contained a declaration to the effect that the judgment was taken without any adjudication of fact or law, and that the judgment was not to constitute evidence or an admission by any of the parties as to any issue.

On October 30, 1978, the government moved pursuant to Paragraph IX to continue both of the provisions.[3] In its memorandum in support of the motion, the government cited the alleged effectiveness of the provisions in assuring the promulgation of workable and effective air pollution control standards and the "healthy competitive climate" which the provisions had fostered as its reasons for seeking to extend them. The defendants opposed the motion on a variety of grounds, including an alleged infringement of their first amendment right to freedom of speech.

The district court initially filed a memorandum disposition in which it extended both IV(A)(2)(a) and IV(A)(2)(g) for a period of ten years. In that memorandum, the

1. In its full text, Paragraph II(B) reads:

" 'Restricted information' means all unpublished information of the type usually classified as company confidential concerning applied as distinguished from basic research in, or concerning the development, innovation, manufacture, use, sale· or installation of Devices. It includes trade secrets, unpublished company policy, and other unpublished technical information for developing, making, improving, or lowering the cost of, Devices by a motor vehicle manufacturer. 'Restricted information' shall not mean (i) information concerning basic research in gaining a fuller knowledge or understanding of the presence, nature, amount, causes, sources, effects or theories of control of motor vehicle emissions in the atmosphere, or (ii) information relating primarily to equipment, methods or procedures for the testing or measurement of Devices, or (iii) information for or resulting from the testing or measurement of production prototypes of Devices of an advanced stage exchanged solely for such purposes. Information shall be deemed to be published when it is disclosed without restriction to the public, or to media of general circulation, or to the trade press, or to meetings of stockholders, dealers, or financial analysts, or to meetings of professional, scientific or engineering societies, or committees thereof, the membership of which is not limited to persons employed by defendants or by motor vehicle manufacturers, or to meetings called by representatives of Federal, state or local governments or agencies authorized to issue motor vehicle emission control regulations."

2. Paragraph IV(A)(2)(g) reads:

"Each defendant is enjoined and restrained from [e]ntering into, adhering to, enforcing or claiming any rights under any provisions of any agreement, arrangement, understanding, plan or program (hereinafter 'agreement') with any other defendant or manufacturer of motor vehicles or Devices:

" * * *

"(g) to file, in the absence of a written authorization for a joint statement by the agency involved, with any governmental regulatory agency in the United States authorized to issue emission standards or regulations for new motor vehicles or Federal motor vehicle safety standards or regulations, any joint statement regarding such standards or regulations except joint statements relating to (i) the authority of the agency involved, (ii) the draftsmanship of or the scientific need for standards or regulations, (iii) test procedures or test data relevant to standards or regulations, or (iv) the general engineering requirements of standards or regulations based upon publicly available information; provided that no joint statement shall be filed which discusses the ability of one or more defendants· to comply with a particular standard or regulation or to do so by a particular time, in the absence of a written agency authorization for such a joint statement, and provided also that any defendant joining in a joint statement shall also file a statement individually upon written request by the agency involved;
. . ."

3. No question as to the timeliness of the government's continuation motion has been raised.

court ruled that the defendants need not consent to the extension, that the government need not prove an antitrust violation in order to obtain the extension, and that extension of the provisions would serve the basic purpose of the decree in fostering competition in the automobile pollution control device market. The court also held that the defendants had waived their first amendment rights by entering into the decree in 1969.

Ford Motor Company subsequently filed a motion to reconsider under F.R.Civ.P. 60(b), saying that conditions had materially changed and that it was no longer equitable that the provisions should have prospective effect. The other defendants later joined in Ford's motion.

On July 16, 1979 the district court entered a memorandum and order reversing its earlier decision and denying the government's motion for extension. The court agreed with the defendants' contentions that changed circumstances rendered extension both inequitable and inconsistent with the public interest. The court found that while the problem of air pollution may have been a predominant national concern in 1969, the energy crises and attendant problems such as increasing automobile fuel efficiency had since assumed greater importance in the eyes of both the public and the federal government. The court noted what it discerned as a trend toward the encouragement of cooperation among domestic auto manufacturers by the government. The Justice Department had recently approved a technical assistance agreement between General Motors and Chrysler whereby Chrysler was to receive two prototype emission control systems and passive belt devices, along with consulting engineers, and had earlier approved a similar agreement between General Motors and American Motors. Also noting the high cost of research and development in the fields of emission control and fuel efficiency, the court observed that a satisfactory solution to these problems would likely require the "combined efforts" of experts in each field. The court further found support for its view of changed conditions from President Carter's announcement of a "basic research initiative" among domestic automobile manufacturers, the ultimate goal of which is the development of an automobile power-plant which will deliver maximum gasoline mileage with minimal toxic emission. The court agreed with the defendants' argument that participation in the President's research initiative would necessarily involve the exchange of "restricted information forbidden by Paragraph IV(A)(2)(a). The court concluded with the following passage:

"In my view, the present environment is so entirely different from that existing in 1969 that an extension of the prohibitions of the consent decree to which the present motion relates would be inappropriate, counter-productive, and unjust both in terms of the purpose of the decree itself and the broader national interest. The government's motion therefore to extend for an additional ten-year period paragraphs IV(A)(2)(a) and IV(A)(2)(g) is hereby denied."

The government's appeal followed.

## II. DISCUSSION

Clearly, we are being requested to render a decision which could have far-ranging implications for the solutions to some of our nation's most serious problems. For that reason alone we would be well advised to approach our disposition with an even greater abundance of caution than normal. However, we also find ourselves confronted with a somewhat novel legal question whose resolution is not aided by clearly defined case law principles. This is ultimately not a case about air pollution or the energy crisis, as largely as those issues might loom over this appeal. This is a case about consent judgments in antitrust litigation, and the proper standard for extending their provisions. With these thoughts in mind, we proceed to our discussion.

On appeal, the government argues that extension of the two provisions at issue is necessary to maintain competition in the field of developing, manufacturing, and installing motor vehicle air pollution control devices. The government has maintained

since the inception of the litigation that the major automobile manufacturers lack an incentive to compete in researching and developing air pollution control devices for the simple reason that the average individual consumer is unwilling to pay more for a car which will pollute less. By filing its civil complaint in 1969, the government sought to put an end to a combination which it charged was suppressing whatever competition might otherwise have existed. It now insists that the competition and consequent developments in air pollution control equipment technology which have occurred in recent years have in part been the result of the two provisions which it now seeks to extend. The gist of the government's theory is that only by keeping each of the manufacturers somewhat in the dark about what the others are doing can serious competition be assured, hence the ban on the exchange of "restricted information." By exchanging restricted information, each of the manufacturers becomes aware of the progress of its competitors, and thereby is able to pace its own research and development at the level of the industry "laggard." The ban on joint statements to regulatory agencies contained in IV(A)(2)(g) is prompted by the reliance of such agencies upon the industry's estimates of current state-of-the-art technology and its projections for future progress. Thus, if the manufacturers are not exchanging restricted information and are making individual as opposed to joint presentations before agencies charged with setting emission standards, the agencies are more apt to receive a true picture of what is achievable. Under the government's scenario, the incentive to compete springs from the possibility of developing a technological breakthrough in air pollution control devices ahead of other manufacturers, and of convincing regulatory agencies to adopt more stringent standards than competitors can match. Competitors can thereby be forced to purchase patent licenses on the pioneering systems at a sizable profit to the industry leader.

Under the government's theory of competitive balance, if the major domestic manufacturers are allowed to exchange information regarding applied research or to appear jointly before regulatory agencies, then the possibility of competition through increasingly stricter regulation is lost. Consequently, the failure to obtain an extension of either provision at issue here would be fatal to competition in the air pollution control equipment market. We mean to express neither approval nor disapproval of the government's theory by this opinion.[4] Whatever might be said on its merits in another context, we are here confronted with a case wherein two provisions which arguably bolster that theory have been agreed to by the defendants and placed in a consent judgment. The question is whether, under the terms of that consent judgment, the provisions should be extended.

The parties have not cited to us any authority which is precisely on point. While there are several cases dealing with modifications of consent judgments, *see, infra,* we have found none construing an extension provision quite like the one in Paragraph IX of the 1969 judgment.

■ A consent judgment or decree has the attributes both of a contract and a judicial act. *See United States v. ITT Continental Baking Co.,* 420 U.S. 223, 236, n.10, 95 S.Ct. 926, 934, 43 L.Ed.2d 148 (1975). To the extent that such a judgment is a contract, an appropriate starting place in construing its meaning and effect are the words of the judgment itself. The dispute here is whether a motion to extend Paragraphs IV(A)(2)(a) and IV(A)(2)(g) should be judged strictly in accordance with the effect of an extension upon competition or whether the propriety of extension should be viewed with an eye to an overriding "public interest" beyond assuring competition. Paragraph IX of the judgment tells us little about what standards the parties

---

4. We note in passing that a number of antitrust actions filed by state governments attacking the underlying conspiracy in this case have failed. *See In re Multidistrict Vehicle Air Pollution,* 367 F.Supp. 1298 (C.D.Cal.1973), *aff'd* 538 F.2d 231 (9th Cir. 1976).

might have contemplated when they negotiated the judgment back in 1969, stating tersely:

"Section IV(A)(2)(a) and (g) of this Final Judgment shall expire ten years after the date of entry hereof, provided that plaintiff may apply to this Court for the continuation of one or both of said provisions, such application to be made not later than nine years after the date of entry of this Final Judgment."

This, then, is not a case where the parties have agreed to a future modification or extension upon the occurrence of some stated contingency. *See, e. g., Safe Flight Instrument Corp. v. United Control,* 576 F.2d 1340 (9th Cir. 1978); *cf. United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968). Had the parties specified such a contingency, the district court could have granted the extension upon finding that the contingency had occurred, and we would review solely for an abuse of discretion. *Safe Flight Instrument Corp. v. United Control, supra.*

Nor is this a case wherein one party to a consent judgment seeks modification under the court's continuing jurisdiction on the basis of changed legal or factual circumstances which render the decree provisions inequitable or inconsistent with the current state of the law. *See System Federation No. 91 v. Wright,* 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961); *United States v. Swift & Company,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932); *E. E. O. C. v. Safeway Stores, Inc.,* 611 F.2d 795 (10th Cir. 1979); *Philadelphia Welfare Rights Organization v. Shapp,* 602 F.2d 1114 (3d Cir. 1979); *United States Steel Corporation v. Fraternal Association of Steel Haulers,* 601 F.2d 1269 (3d Cir. 1979); *United States v. Radio Corporation of America,* 46 F.Supp. 654 (D.Del.1942), *appeal dismissed,* 318 U.S. 796, 63 S.Ct. 851, 87 L.Ed. 1161 (1943); *cf. Ford Motor Company v. United States,* 335 U.S. 303, 69 S.Ct. 93, 93 L.Ed. 24 (1948); *Chrysler Corp. v. United States,* 316 U.S. 556, 62 S.Ct. 1146, 86 L.Ed. 1668 (1942). Under the standard of *United States v. Swift, supra,* modification would be appro- priate only if through changed circumstances the decree had become an "instrument of wrong." 286 U.S. at 114, 115, 52 S.Ct. at 462.

Factually, the present case is closest to the Supreme Court's decisions in *Ford Motor Company v. United States, supra,* and *Chrysler Corp. v. United States, supra.* Both decisions arose out of identical consent decrees which Ford and Chrysler had entered into in 1938. Both companies agreed to stop engaging in certain practices regarding automobile purchase financing which allegedly restrained competition in the automobile credit field. General Motors, also accused of engaging in the same anticompetitive practices, refused to settle, however. Accordingly, both Ford and Chrysler insisted on the insertion of a provision in their respective judgments whereby prohibitions against the acquisition of finance companies would be lifted if the government did not obtain by January 1, 1941, a decree requiring General Motors to divest itself of its finance company holdings.

The government did not initiate a suit to force divestiture of General Motors' finance company until October 1940. It moved in December 1940 to have the expiration date extended until January 1942, and the district court granted that motion. As the GM suit continued to drag on through 1941, the government sought another extension until 1943. Chrysler opposed this second motion, which the district court also granted. Upon Chrysler's appeal, the Supreme Court affirmed the extension. The Court noted that the proper test to apply would be whether "the change served to effectuate or thwart the basic purpose of the original consent decree." 316 U.S. at 562, 62 S.Ct. at 1149. The Court found that the purpose of the provision which made Ford's ban on credit company affiliation dependent upon the outcome of the General Motors litigation was to shield Chrysler from any competitive disadvantage which might accrue from GM being free to engage in practices which Chrysler was forbidden from following. Because the onset of World War Two

had temporarily suspended production of consumer automobiles, the Court found that Chrysler could suffer no competitive disadvantage from a continuation of the affiliation provision.

Six years later, however, the government was not treated so sympathetically as it sought to extend the provision again in *Ford Motor Co.* Ford had not opposed the government's successive motions for one-year extensions of the decree until December 1945, when it resisted a motion to extend until January 1947. The Court this time found that extension of the decree would result in the very inequality against which Ford had originally bargained. The post-war resumption of automobile production and marketing now rendered further application of the finance company affiliation prohibition against Ford inappropriate. As the Court noted:

"The appellants agreed for a limited term to refrain from pursuing conduct which, in the absence of an adjudication that it was illegal, they were otherwise free to pursue and which General Motors has always been free to pursue. There has been no such adjudication and successive extensions of the term have expired. The crucial fact now is not the degree of actual disadvantage but the persistence of an inequality against which the appellants had secured the Government's protection."

335 U.S. at 322, 69 S.Ct. at 102.

Neither *Ford Motor Co.* nor *Chrysler Corp.* is directly applicable to the present case because there was no express provision in the 1938 consent decrees which allowed for an application for extension. Yet, taken together,[5] they suggest a mode of analysis which is relevant to our inquiry. In each case, the government's motion to extend a provision whose application was limited as of a specific date was evaluated in light of the purpose of the provision in the overall context of the judgment. In *Chrysler*, the test was announced to be whether the extension was necessary to effectuate the purpose of the decree. In both cases,

the Court paid particular attention to the consensual nature of the judgment and gave effect to the apparent reasonable expectations of the parties at the time they entered into the judgment.

The Supreme Court has since suggested that it is not proper to speak in terms of a consent decree having a "purpose"; rather it is more correct to speak in terms of the parties having conflicting purposes which find their way into the decree depending upon the relative bargaining strength of the parties. *See United States v. Armour & Co.*, 402 U.S. 673, 681, 682, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256 (1971). *See also* Note, *Flexibility and Finality in Antitrust Consent Decrees*, 80 Harv.L.Rev. 1303 (1967).

■ We do not believe that the Supreme Court by its opinion in *Armour & Co.* meant to imply that consent judgments are to be interpreted in a static fashion with no reference to the interrelationship of their provisions. We read *Armour* to state merely that a consent judgment cannot be construed by reference to some overall "purpose" to include prohibitions which the parties have not expressly placed in the judgment.

■ We also do not read *Armour* to overrule the admonition of *Chrysler Co.* that the extension of consent judgments must be evaluated in light of effectuation of the basic purpose of the decree. The authority of a federal district court to adopt a consent decree comes only from the statute which the decree is intended to enforce. *System Federation No. 91 v. Wright, supra*, 364 U.S. at 651, 81 S.Ct. at 373. If there is a "purpose" to be effectuated, it is the purpose of the statute pursuant to which the government seeks relief. Within that framework, the parties strike their bargain.

At first glance, the district court would appear to have exercised its discretion in accordance with these general principles. The court read the original purpose of the consent decree as being the stimulation of competition in the research and development of automobile air pollution equipment among the major domestic automobile man-

**5.** We reject the suggestion that *Ford* somehow overrules *Chrysler*. The same analysis was applied in each, only the factual circumstances were different.

ufacturers. It then inquired into "changed circumstances" since 1969 and concluded, mainly on the basis of the emergence of the energy crisis and of the high cost of developing air pollution control technology, that it would now be inequitable to extend the contested provisions of the judgment. In so doing, the court formed its own conclusions as to how the public interest would best be served in the present case, noting that:

> "Today, as reflected by recent regulations promulgated 'fuel efficiency and conservation' have arguably surpassed 'air pollution' as one of the nation's critical concerns. The solution to both of these problems is made more complex by the fact that technology which aids emission controls is not always compatible with fuel efficiency engineering; in fact, in some instances, the two technologies may conflict. Efforts to solve both problems therefore must proceed synergistically with full recognition of the demands and needs of each. If these efforts are to succeed, a key component now appears to be cooperation between the entities possessing the requisite technical and economic capabilities."

The district court has made a laudable effort to solve a problem whose ramifications raise issues of not only a legal nature, but are also of technological and economic import. We believe that it erred, however, in basing its decision upon such a broadly-construed view of the public interest. The court's perceptions of public policy here may be entirely reasonable and correct, yet the emphasis which the court placed on what it regarded as the relevant policy questions has obscured the more mundane legal issues which must be addressed. We cannot emphasize too strongly the unique nature of the judgment before us. The parties agreed at the time that they originally stipulated to judgment that Paragraphs IV(A)(2)(a) and IV(A)(2)(g) were to have effect for only 10 years, and that the government could "apply" for an extension upon termination of that period. Prior decisions indicate that we must evaluate a consent judgment in many respects as a contract, and that as a contract its interpretation may often be influenced by the reasonable expectations of the parties at the time that they entered into the stipulation of judgment. Paragraph IX of the judgment before us does not provide the district court with explicit guidance as to what standards, if any, the parties might have contemplated for extending the provisions in question. It merely allows for the government to "apply" for an extension.

■ We believe that the parties' intentions as to the meaning of Paragraph IX must be discerned before an extension may be granted or denied. The manufacturers clearly thought it important that these provisions be limited in time, and that they be extended only upon further judicial consideration. The government apparently contemplated that effectuation of the permanent provisions of the decree might be dependent upon prolonged enforcement of the prohibitions against exchange of restricted information and joint statements to regulatory agencies. The judgment, however, is silent on the issue of what sorts of considerations would be relevant in determining whether further extensions would be appropriate. This is precisely the determination which the district court must make upon remand. The expectations of the parties must be discerned. While the district court is bound to construe the judgment by the meaning to be found within its "four corners," *United States v. Armour & Co., supra,* 402 U.S. at 682, 91 S.Ct. at 1757, the court may also consider the surrounding circumstances at formation as aids in construing the judgment. *Kittitas Reclamation District v. Sunnyside Valley Irrigation District,* 626 F.2d 95, 98 (9th Cir. 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 861, 66 L.Ed.2d 802 (1981).

■ The parties' understanding of Paragraph IX at the time of formation will not necessarily be controlling, however. A purpose or understanding contrary to the policies of the Sherman Act would obviously be unenforceable. The parties may not enter into a consent judgment inconsistent with the statutory framework under which the action was brought.

Once the district court arrives at a determination of the meaning of Paragraph IX

as understood by the parties, it could well determine that the same "changed circumstances" which prompted it to deny extension in the first instance have continuing relevance. Unforeseen complications such as increased pressure to improve fuel efficiency and consequent difficulties in designing adequate pollution control equipment without more extensive cooperation than the judgment contemplated in 1969 may have been the type of contingency which the manufacturers sought to guard against when they insisted that the ban on exchange of "restricted information" be limited to ten years. We indulge in this sort of speculation here for illustrative purposes only. The district court's findings may raise considerations not apparent at this stage of the proceedings.

The decision of the district court will ultimately be a matter within the exercise of its sound discretion. That discretion, however, must be exercised against a backdrop of findings which include the parties' reasonable expectations and understandings of the meaning of Paragraph IX, the statutory framework under which the government originally brought the action, and a balancing of the equities in light of the aforementioned considerations.

The district court indicated that it agreed with the contention of the defendant Ford Motor Co. that the prototype emission system exchange agreements between General Motors, Chrysler, and American Motors place it at a competitive disadvantage, without entering any specific findings on the subject. The government on appeal has contended that the approved exchange agreements do not place Ford at a disadvantage. We leave it to the district court to resolve the conflict via specific findings. The court might also consider modification of the decree to ameliorate the disadvantage to Ford if if finds the extensions otherwise appropriate.

We also defer to the district court for a ruling on the defendants' first amendment claims regarding Paragraph IV(A)(2)(g). The question of whether the defendants' waiver of their first amendment rights for an initial ten-year period would be subject to continuance without further agreement is bound up in the interpretation of Paragraph IX. Accordingly, we feel it inappropriate to reach the merits of defendants' claim here.

In sum, we hold that (1) the district court did not properly exercise its discretion in failing to determine what the parties' understanding of Paragraph IX entailed, (2) the government's motion for extension must be considered in light of the parties' bargain, and other factors described above, and the court may rely upon extrinsic aids in determining the terms of that bargain, and (3) the defendants' claims of inequitable application of the decree and of first amendment infringement are also remanded for further findings in light of whatever findings the court might issue on points (1) and (2). We also reiterate that a ruling on the government's motion will be within the discretion of the district court, based upon the guidelines contained in this opinion.

### III. CONCLUSION

The judgment of the court below is

REVERSED and REMANDED for further findings.