**UNITED STATES of America,**
**Plaintiff,**

v.

**SWIFT & COMPANY, Armour and Company, The Cudahy Packing Company, et al., Defendants.**

**Civ. A. No. 58 C 613.**

United States District Court
N. D. Illinois, E. D.
Dec. 12, 1960.

See also D.C., 24 F.R.D. 280.

Earl A. Jinkinson, Willis L. Hotchkiss, Ned Robertson, Chicago, Ill., for plaintiff.

John T. Chadwell, Theodore A. Groenke, James A. Rahl, John W. Thomas, Arthur C. O'Meara, John C. Berghoff, Arthur R. Curtis, Chicago, Ill., for Swift defendants; Snyder, Chadwell, Keck, Kayser & Ruggles, Chicago, Ill., of counsel.

Weymouth Kirkland, E. Houston Harsha, William R. Jentes, George E. Leonard, Jr., John P. Doyle, Chicago, Ill., for defendant Armour & Co.; Kirkland, Ellis, Hodson, Chaffetz & Masters, Chicago, Ill., of counsel.

E. H. McDermott, Walker Smith, Hamilton Smith, James O. Smith, John H. McDermott, Frank E. Babb, Chicago, Ill., Frederick T. Barrett, Omaha, Neb., for defendants the Cudahy Packing Co. and E. A. Cudahy, Jr.; McDermott, Will & Emery, Chicago, Ill., of counsel.

Howard J. Trienens, H. Blair White, Clarence F. Wittenstrom, Jr., Chicago, Ill., amici curiae; Sidley, Austin, Burgess & Smith, Chicago, Ill., of counsel.

JULIUS J. HOFFMAN, District Judge.

The petitioners, defendants in this historic litigation, have sought modification of the antitrust decree entered with their consent forty years ago. The government has vigorously opposed the petitions.

■ Following extensive discovery proceedings and the disposition of preliminary motions, the parties were afforded the plenary hearing required upon such a petition. Hughes v. United States, 1942, 342 U.S. 353, 72 S.Ct. 306, 96 L.Ed. 394. Oral testimony occupied some three and one-half months, producing a transcript in excess of eight thousand pages. Nearly one thousand exhibits have been received, containing an even greater volume of pages. As the record indicates, the court had grave doubt of the admissibility of portions of the petitioners' evidence, both oral and documentary. Much of it was remote and of tenuous relevancy, or entailed matters of general opinion. It was the position of the court, however, throughout the lengthy hearing, that the equitable nature of the proceeding warranted giving the petitioners every opportunity to support their request.

The court has been aided by detailed and exhaustive briefs, running to another thousand pages, and by full oral pres-

entation of the parties' positions. The court also has before it the complete record of the prior proceedings in the case. The quality of representation on all sides has been exceptional.

### The Original Decree.

The antitrust history of the defendants goes back to the turn of the century. In 1902 the government filed a civil suit against the defendants which eventuated in a general injunction. Swift & Co. v. United States, 1905, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518. Subsequent criminal prosecutions failed. In 1917, at the direction of President Wilson, the Federal Trade Commission commenced a broad investigation of the meat packing industry. The report of this investigation, submitted in 1919, led to the commencement of the litigation in which this proceeding constitutes the latest chapter.

### The Parties.

The suit was begun on February 27, 1920, in what was then called the Supreme Court of the District of Columbia. The principal defendants were the so-called Big Five of the meat packing industry: Swift & Company, Armour and Company, The Cudahy Packing Company, Wilson & Co., Inc., and Morris & Company. Eighty other corporations, comprising those subsidiaries of the principal defendants which were engaged in slaughtering, packing, or selling meats, were also joined as defendants. Fifty of the officers, directors, and stockholders of the corporate defendants were named and joined individually as defendants. Of these one hundred and thirty-five original defendants, only six are now before the court as petitioners. One of the five principal defendants, Morris & Company, was absorbed by Armour and Company in 1923. Another, Wilson & Co., Inc., has not petitioned for modification or entered its appearance in this proceeding. The remaining three principal defendants, appearing here as petitioners, will be called Swift, Armour, and Cudahy. All of their subsidiaries which were joined as parties originally have since been dissolved with the exception of two Swift subsidiaries, Swift and Company, Inc., and Derby Foods, Inc., which will be included in the designation Swift. The sole survivor of the officers, directors, and stockholders of these corporate defendants who had been joined individually as parties who has petitioned here is E. A. Cudahy, Jr. The petitioners are, therefore, Swift, including its two subsidiaries, Armour, Cudahy, and E. A. Cudahy, Jr.

### The Complaint.

The equity bill which commenced this suit consists of some thirty pages. The stated object of the action was to put an end to monopolies achieved by the defendants affecting the food supply of the nation, and to prevent the extension of this domination into other fields.

The defendants' principal business, it was alleged, consisted of the purchase and slaughter of livestock, namely, cattle, hogs, sheep, and calves, the dressing of the carcasses, and the distribution and sale of the dressed meats. Domination of the purchase of livestock, it was charged, had been achieved, pursuant to a common purpose, plan, and design, by various means. First, the complaint recited, the defendants had acquired controlling interests in some twenty-two of the nation's stockyards, the public markets where livestock were bought and sold. Through the fees, charges, and services of the yards, they thereby gained power over the throat of the commerce involved. Through their interests in these yards, the defendants were also able to determine the number and location of packing plants in the desirable locations at and adjacent to the stockyards. Terminal railways, connecting the long-haul roads with the stockyards and the packing plants, had also fallen under the domination of the defendants according to the bill, giving them power to discriminate against other packers and independent buyers. Dominion over the other facilities required by traders and dealers at the yards was also achieved. Included was the allocation of office space,

pens, and sites for stockyard banks, cattle loan companies, and rendering plants for the disposal of stock killed by accident or disease in the yards. According to the allegations of the government's complaint, the defendants had also gained control of the trade newspapers and market journals which cattle raisers must rely upon for accurate and unbiased reporting of demand. As a consequence, the defendants were furnished with a means of increasing or decreasing the flow of livestock to the yards in their own interests.

By wielding these powers, it was charged, the defendants had gradually forced out their competitors as dominating factors in the marketing of livestock. To eliminate competition among themselves, the government claimed, the defendants had entered into percentage purchase arrangements, apportioning the livestock offered at the several stockyards to the respective defendants in predetermined shares.

Concerning the marketing side of the defendants' businesses, the complaint alleged that the packers had developed a nationwide system for distributing and selling meats. A principal instrumentality in the system was called the branch house, a storage station with facilities for cooling and preserving fresh meats, from which sales were made to butchers, hotels, restaurants and other large consumers. The defendants maintained 1120 of these branch houses in various large towns and cities throughout the United States, according to the bill, while competing interstate slaughterers maintained only 139.

To supplement the branch houses, and to serve the smaller communities, the defendants employed refrigerated railroad cars traveling over specified routes and filling orders for smaller quantities. The route cars operated by the defendants, it was alleged, constituted 90% of the total number operated in the packing industry. As an adjunct, the defendants, and particularly Armour, employed motor trucks to serve purchasers not conveniently reached by rail, in a total of 20,836 towns

throughout the United States. As a part of their distribution system, it was stated, the defendant packers owned for their private use a number of cold storage warehouses where fresh meat products might be stored, and had acquired control as well of public cold storage warehouses engaged in the general business of leasing space for products requiring refrigeration.

Having eliminated competition in meats, the defendants, according to the government, set out to control the substitute foods to which the consuming public might turn from high-priced meats. To accomplish this purpose, the defendants had begun to deal, directly and through subsidiaries, in fish, vegetables, fruits, cereals, milk, poultry, butter, eggs, cheese, and other so-called substitute foods as well as in meats. In addition, they acquired a large number of concerns manufacturing or selling these substitute foods, availing themselves of the financial resources amassed through their dominance in meats. Further control over other foods was achieved, it was alleged, through contracts for the defendants' purchase of the entire or exclusive output of many companies engaged in the production of these foods. In marketing these non-meat foods, the defendants availed themselves of their distribution systems and facilities designed principally for the handling of meats "with comparatively no increase of overhead." This advantage enabled the defendants to reach remote spots, it was alleged, and was employed temporarily to fix prices so low as to eliminate competition.

As the result of these activities, the complaint averred, the defendants had enjoyed an extraordinary rate of growth and had achieved immense size. In the fifteen years from 1904 to 1919, the combined net worth of Swift, Armour, Cudahy and Wilson had increased fivefold to nearly half a billion dollars. The net profits of the five principal defendants for the year 1917 nearly equalled their total net worth in 1904. Their combined sales amounted to three billion two hun-

dred million dollars for 1918. The principal corporate defendants and the individual defendants and their families held controlling interests in 574 corporations and concerns, and lesser or indefinite interests in another 188.

In its concluding paragraphs, the government's bill of complaint prayed generally for an injunction prohibiting the defendants from entering into or carrying out any contract or combination in restraint of trade, from monopolizing or attempting to monopolize commerce in livestock or foods, and from engaging in unlawful practices or unfair competition to restrain or monopolize trade or commerce. Specifically, the complaint requested a decree requiring the defendants to divest themselves of the instrumentalities of monopoly in meats, including retail meat markets, stockyards, terminal railways, market or trade journals, and public cold storage warehouses. In the field of substitute foods, so-called, the government demanded that the defendants divest themselves of all interests in concerns dealing in such foods, and discontinue direct dealings. To assure this divestiture, the government asked that the decree enjoin the defendants from re-acquiring any interests so divested, from obtaining any new interest in any concern dealing in prohibited substitute foods, and from engaging themselves in any dealings in these foods. To complete the divorcement of meats from substitute foods, the bill demanded that the defendants be enjoined from permitting their railroad cars, motor trucks, branch houses, or other distributive facilities to be used by anyone in the handling of prohibited commodities.

### The Decree.

On the same day that the government filed its complaint with the court, a separate answer was filed on behalf of each of the five principal defendants and its corporate subsidiaries and affiliated individual defendants. These answers responded in extensive and minute detail to all the averments of the government's bill, and denied each material allegation.

At the same time, the parties presented to the court a stipulation, agreeing to the entry of an attached decree of injunction. On behalf of the defendants, the stipulation stated that while maintaining the truth of their answers and their innocence of any violation, they desired "to avoid every appearance of placing themselves in a position of antagonism to the Government" and therefore consented, with the proviso that their consent should not be regarded as an admission, nor the decree as an adjudication, that they had in fact violated any law of the United States.

The stipulated decree was entered that day. Its recital of the parties' consent was followed by eighteen operative paragraphs. Summarized in numerical order, these paragraphs decreed as follows:

*First.* The corporate defendants were enjoined, jointly and severally, from contracting, combining, or conspiring to restrain, and from monopolizing, or attempting or conspiring to monopolize, trade or commerce;

*Second.* The defendants, jointly and severally, were restrained from owning any interest in any stockyard, terminal railroad, or market newspaper or journal;

*Third.* The corporate defendants were enjoined from using or permitting others to use their distributive system and facilities, including branch houses, railroad cars, and motor trucks, for handling or dealing in the non-meat foods specified in paragraph Fourth; the defendants were permitted to dispose of surplus or obsolete facilities free of the restrictions of the decree, subject to a requirement of court approval for sale of any substantial part of the system;

*Fourth.* The corporate defendants, jointly and severally, were enjoined from engaging in the business of handling, and from owning any interest in a concern engaged in handling, fourteen specified classes of foods and miscellaneous items, illustrated by a listing of 145 named commodities; the enumerated

classes were (1) fish, (2) vegetables, except in combination with meats, (3) fruits, (4) confectionery and soda fountain supplies, (5) molasses, jellies, and similar sweets, (6) spices, sauces, and condiments, (7) coffee, tea, chocolate and cocoa, (8) nuts, excluding peanuts, (9) flour, sugar, and rice, (10) bread, wafers, crackers, and biscuits, (11) cereals, (12) grain, (13) miscellaneous articles, including specified building materials, food-handling equipment and supplies, and cigars, china, and furniture, and (14) grape juice;

*Fifth.* The individual defendants were enjoined from holding a controlling interest in any concern handling or dealing in the commodities listed in paragraph Fourth;

*Sixth.* The defendants were restrained from owning or conducting any retail meat markets, other than for the accommodation of employees at their plants;

*Seventh.* The defendants were enjoined from owning any interest in public cold storage warehouses except in connection with their packing plants or as necessary in handling meats and other permitted commodities;

*Eighth.* The corporate defendants were enjoined from handling or dealing in fresh milk or cream, and from owning any interest in any concern so engaged, except as necessary to their dealing in condensed, evaporated, or powdered milk, butter, oleomargarine, ice cream, cheese, or buttermilk, or in combination with meats or other permitted items;

*Ninth.* The corporate defendants were enjoined from engaging in illegal trade practices;

*Tenth.* The defendants were directed to submit to the court, within 90 days, a plan for divesting themselves of ownership in stockyards, terminal railroads, and market newspapers and journals, and to dispose of these interests within the time and upon terms fixed by the court;

*Eleventh.* The defendants were directed, within nine months and with court approval, to divest themselves and dispose of their interests in retail meat markets and public cold storage warehouses;

*Twelfth.* The defendants were directed, within two years and with court approval, to divest themselves of all interest in concerns engaged in handling the prohibited items enumerated in paragraph Fourth, to divorce or discontinue any branches or departments so engaged, and to dispose of all such commodities in stock or on hand;

*Thirteenth.* In the disposition of their interests in any stockyard at which they maintained packing plants, the defendants and their purchasers were required to agree to continue the operation of the stockyard and the packing plants, respectively, for a period of ten years.

*Fourteenth.* Nothing in the decree should be construed to prohibit the defendants from doing anything, otherwise lawful, in the United States in connection with their export trade or foreign commerce;

*Fifteenth.* Nothing in the decree should be construed to preclude the government from proceeding, civilly or criminally, against the defendants for any violation of law in the buying or selling of poultry, butter, eggs, or cheese, or any other business or activity not mentioned in the decree;

*Sixteenth.* The defendants were directed to supply information upon the request of the Attorney General and to permit inspection of their books and records, for the purpose of assuring compliance with the decree;

*Seventeenth.* All the defendants' sales or dispositions of properties or businesses which had been made within the five months preceding the entry of the decree and which otherwise would have been required by the decree were to be submitted to the court for determination of whether they were in accordance with the spirit and purpose of the decree;

*Eighteenth.* The court retained jurisdiction to take any further action that might be necessary to carry out the decree and to entertain any applications by the parties with respect to it.

It is apparent that the decree was the product, in principal part, of negotiation between the defendants and the government. Within a single day the government filed its complaint, the defendants appeared and filed lengthy answers, the parties presented their stipulation and consent to a detailed and complex decree, and the decree was entered. The circumstances precluded extensive judicial consideration or analysis. No evidence was offered, no findings of fact were made, and no opinion was prepared to explain the decree.

In large part, the decree was responsive to the government's complaint. As demanded in its prayer, the defendants were required to divest themselves of their interests in stockyards, terminal railways, market newspapers and journals, public cold storage warehouses, and retail meat markets. They were also required to divest themselves of the business of handling certain of the items described by the complaint as substitute foods, although in this respect the decree does not extend to the full limits of the complaint. The government had charged the defendants specifically with seeking to control fish, vegetables, fruits, cereals, milk, poultry, butter, eggs, and cheese; the decree as entered reached only the first five of these commodities, and left the defendants free to engage in the business of handling poultry, butter, eggs, and cheese, along with a miscellany of non-meat foods not prohibited by the decree and a wide range of non-food commodities. The core of the defendants' business activities remained untouched. They were left free to engage in meat packing, including slaughter, dressing and processing, and distributing at wholesale, without hindrance. In this field, their corporate empires were not dismembered, and they retained their huge size. The decree confined their power, however, and prevented its exercise or extension in the meat industry either backward in the direction of livestock marketing, or forward in the direction of retail marketing. What is known as vertical integration was foreclosed thereby to a significant degree. Although short of monopolization the defendants were free to expand their operations horizontally, as meat packers, they were excluded, for all practical purposes, from participating generally in the food industry. Their economic power was thus not destroyed but rather hemmed in.

### Subsequent Proceedings.

With the entry of the consent decree, this litigation entered its second phase. In 1921, the National Wholesale Grocers Association and the American Wholesale Grocers Association were permitted to intervene in the proceedings for the limited purpose of receiving notice and being heard in opposition to any proposed change in the decree that would deprive them of its protections. On April 19, 1922, the California Cooperative Canneries filed an intervening petition, seeking to invalidate the consent decree in its entirety. It appeared that this intervenor had agreed with Armour to supply Armour's total requirements of California canned fruits for a ten year period, and had committed the principal part of its output to this contract. The petition claimed the consent decree was void on several grounds. The defendants' refusal to admit any violation of law, it was argued, deprived the court of power to enter the decree. Since the complaint did not charge that it was illegal for the defendants to engage in the grocery business, that portion of the decree, at least, could not be supported, it was claimed. The intervenor contended, too, that the decree was so general as to be a nullity, and that it was superseded by the Packers and Stockyards Act of August 15, 1921, 42 Stat. 159, 163, 7 U.S.C.A. § 181 et seq. The motion for leave to intervene was denied in the trial court, but the Court of Appeals for the District of Columbia reversed the denial in September, 1924. (California Cooperative Canneries v. United States, 1924, 55 App. D.C. 36, 299 F. 908).

In November, 1924, motions were presented on behalf of Swift and Armour, their subsidiaries and officers, to invali-

date the consent decree on similar grounds, and more particularly, because no case or controversy was before the court, because no facts were found to support the court's jurisdiction, because the decree violated the antitrust laws by forbidding lawful competition, and because the Attorney General was without power to consent to the decree on behalf of the United States.

These motions were argued together. The trial court denied the motion to vacate the decree presented on behalf of Swift and Armour, but by order of May 1, 1925, suspended the operation of the decree, in pursuance of the Court of Appeals' mandate, until the intervening petition of California Cooperative Canneries could be fully heard on the merits.

Upon appeal from the denial of the Swift and Armour motions, the United States Supreme Court affirmed, upholding the validity of the decree. Swift & Co. v. United States, 1928, 276 U.S. 311, 48 S.Ct. 311, 72 L.Ed. 587. The suspension, however, remained in force until set aside a year later by the Supreme Court in United States v. California Cooperative Canneries, 1929, 279 U.S. 553, 49 S.Ct. 423, 73 L.Ed. 838. Upon receipt of the mandate of the United States Supreme Court, the trial court on July 24, 1929, revoked the suspension of the decree. On the same day, however, Swift and Armour filed motions to extend the time for compliance with the decree, and the court granted a temporary extension for all defendants until the motions could be fully heard. Before these motions came on for hearing, however, and on August 10, 1929, they were superseded by petitions on behalf of Swift and Armour to modify the decree and to vacate its principal prohibitions.

The petitions for modification, as amended on April 2, 1930, accepted the consent decree as valid and lawful when entered. This request for relief from its prohibitions was based therefore not upon any asserted defect in the original proceedings, but rather upon the claim that the decree had become, in the ten years since its entry, unnecessary and

unjust in view of "radical and revolutionary changes" in economic conditions. These changes, it was claimed, were both unexpected and unforeseen, and worked a revolution in food distribution methods.

Because the petitions now before the court proceed upon the same underlying theory, the 1930 petitions warrant full examination for comparative purposes.

Although these petitions of Swift and Armour vary in their detail, both are based upon two major propositions: First, that the defendants no longer occupied the monopolistic position in the meat packing industry which they held at the time the decree was entered in 1920; and Second, that economic changes since 1920 had eliminated any danger that the defendants might employ any dominance in the meat industry as a weapon to achieve control in the marketing of non-meat foods and other commodities. It followed, they argued, that the decree without reason or need restrained lawful competition by prohibiting the defendants from making efficient use of their facilities and experience and from diversifying their businesses as their rivals were free to do, to the injury of the general public as well as the defendants.

In support of the first branch of their argument, the petitions alleged that any combination among the defendants had been dissolved, that they were parties to no agreements in restraint of trade, and that they were engaged in active and open competition with each other. The defendants themselves had undergone changes since the decree. The Armour stock, formerly held by the Armour family, had been dispersed and was publicly held. Armour had been refinanced, and Wilson & Co., Inc., had gone through receivership and bankruptcy proceedings as well as refinancing. Morris & Company had sold its assets to Armour and had gone out of business. Several subsidiary corporations had been dissolved, and a number of the individual defendants had either died or severed their connections with the defendants since

the entry of the decree. All of the defendants, it was claimed, had suffered losses and declining sales volume in the decade of the twenties.

Several legal developments were also relied upon in support of the requested modification. The government's legal theory, embodied in the decree, was said to be that size alone constituted an offense under the Sherman Act, 15 U.S.C.A. §§ 1–7; 15 note, and this theory, the defendants argued, had been rejected in United States v. United States Steel Corp., 1920, 251 U.S. 417, 450–451, 40 S.Ct. 293, 64 L.Ed. 343, after the entry of the decree by the Supreme Court. By the enactment of the Packers and Stockyards Act of August 15, 1921, 42 Stat. 159, 163, Congress had conferred regulatory control over the packing industry and public stockyards upon the Secretary of Agriculture, thereby rendering the judicial decree totally unnecessary according to the petitions. The petitions also recited that the court had appointed two trustees of the stock held by Swift and Armour in public stockyard companies, pursuant to the provisions of the decree directing disposal of this stock, and that after full and lengthy public hearings at the stockyards these impartial trustees had found nothing unfair, illegal, or discriminatory in the operation of the stockyards, terminal railroads, or other facilities. Since the entry of the decree, the petitions reported, the Department of Agriculture had undertaken a program of livestock market reporting which made precise information readily available by wire and radio to livestock producers throughout the country, and destroyed any monopolistic control the defendants might have exerted through ownership of stockyard newspapers and market journals. In 1921, the defendants averred, the Interstate Commerce Commission, in a hearing upon the complaint of wholesale grocers, concluded that the defendants' ownership and use of refrigerator cars gave them no unfair advantage or preference. (National Wholesale Grocers Ass'n v. Alabama & Vicksburg Ry., 62 I.C.Re-

ports 375, June 22, 1921). Finally, the defendants relied upon the decision of the Secretary of Agriculture in proceedings commenced by him in 1923 to inquire into the Armour acquisition of the physical properties of Morris & Company. After exhaustive hearings under the Packers and Stockyards Act, the Secretary had concluded that the merger would not have the tendency or effect of restraining interstate commerce or of creating a monopoly, and that competition in the meat industry was keen and active.

Factual change as well as legal development showed, according to the petitions, that the defendants no longer occupied a dominant position in the meat industry. None of the defendants individually enjoyed a share of the business that would amount to monopoly, and their combined share of the total slaughter of livestock in the United States had fallen since the decree from 48% to 36%, and their combined share of federally inspected slaughter fell from 69% to 54%. The total sales of each of the defendants, measured in dollars, were lower in 1929 than in 1920, while the sales of competing meat packers increased. At the same time the defendants' margin of profit on sales was low and declining, while the profit margin of the smaller packers was greater and increasing.

The defendants' distributive facilities no longer served to give them a commanding competitive position in the meat industry, they alleged. The refrigerated railroad cars owned by the defendants conferred no advantage, since the development of motor trucks and the construction of hard-surfaced roads during the ten years since entry of the decree had provided competing packers with an effective means to reach consumers. The branch house system of the defendants was being rendered obsolete, according to the defendants, by the trend toward integration and mass selling. Since the decree, grocery chains had established their own distributing depots, taking large shipments directly from packing

plants. As a result, the defendants were forced to use their branch houses principally to serve the small independent retailer, in decreased volume and at higher cost per unit sold. In consequence, the defendants had been forced to close a number of branch houses, and to operate others at a loss.

In the second branch of the defendants' petitions for modification, they claimed that any dominance they might still enjoy in the meat industry could no longer be carried over into the marketing of other foods, in view of the claimed revolution in merchandising methods. This revolution was characterized principally, according to the petitions, by widespread integration in the food business, by mass selling, by the growth in use and importance of private brands, and by wide diversification of products handled at each market level. At each level, it was claimed, large and powerful concerns had emerged, offering a countervailing power to the defendants and eliminating any danger from the defendants' entry into other branches of the food industry.

### Retailing.

At the retail level, the petitions relied upon the rapid growth of the chains to demonstrate that the decree was no longer needed. Since 1920, they alleged, the number of chain retail outlets had increased from 27,000 to 75,000, and their total sales had nearly trebled until they held 40% of the total retail grocery business. The largest of these chains, A & P, had total sales in excess of one billion dollars in 1929, roughly equalling the total sales of the largest defendant, and the total sales of all chains were said to have grown to approximately three and one-half billion dollars annually.

A parallel development since the entry of the decree was the growth of the so-called voluntary chains, established either by a grocery wholesaler contracting with a number of independent retailers to supply their grocery needs and to furnish merchandising and managerial assistance, or by a group of independent retailers associated together to conduct cooperative wholesale operations. The number of retail stores so integrated and combined had grown to 60,000 by 1929, according to the petitions.

In view of the strength of these retailers, it was said, there was no longer anything to be feared from the defendants' entry into the grocery business as competing retailers. The chains generally enjoyed a higher margin of profit than the defendants, it was claimed: comparing five selected chains with the defendants, profits as a percentage of sales were 2.7% for the chains to 1.3% for the defendants, as a percentage of net worth, 23% for the chains to 5% for the defendants, and as a percentage of investment, 17% for the chains to less than 5% for the defendants. At the same time the chains benefited from a higher proportion of equity investment, relying upon borrowing for only 2% of their funds as compared with the 30% borrowed by the defendants, and enjoyed more available working capital.

Another marketing change alleged by the petitions was the rapidly accelerating trend toward combination stores, that is, stores selling both meats and groceries. At the time of the entry of the decree in 1920, it was claimed, only a few hundred retail outlets handled both meats and groceries, while by 1929 an estimated 20% of all meat sales were made by combination stores. The trend was especially rapid among chains, which had begun to sell meats, it was alleged, in an estimated one-third of their stores.

These developments rendered the prohibitions against the defendants' retailing meats both unnecessary and unjust, it was said. In view of the combined power of the chains as meat retailers, the defendants could no longer assume control of that market and the protection of the decree was not needed. And the decree was rendered unjust since this integration reduced the number of potential buyers for the defendants' meat and left them at the mercy of the large chains, who might simply decline to deal and leave the defendants stranded with a large supply of perishable meats. De-

prived of the opportunity to retail their own products, the defendants were placed increasingly at the mercy of the chains as the only outlet to the consumer. Competing packers, however, were free to retail their products, and many operated meat markets. The defendants also claimed they were handicapped by the innovation of the private brand, affixed by the chain or the retailer to the products sold. To assure continued consumer demand for and acceptance of his products, they contended, a national packer must keep its brand name before the public. Forbidden to retail their own products and compelled to market through others who affixed their own brands, the defendants were losing their standing.

In the face of the trend toward diversified retailing and the combined selling of meats, the defendants claimed that modification of the decree to allow them to sell at retail only meat or groceries would be of no avail. Anything short of combined selling would be impracticable and would not enable them to compete effectively.

### Wholesale Groceries.

The integration of retail and wholesale functions in the grocery business as exemplified by the growth of the chains was also relied upon as eliminating any possible anti-competitive effects of the defendants' entry into the handling of groceries at wholesale. Since an increasing number of retail outlets were tied to wholesalers, either in chains or voluntary or cooperative arrangements, the defendants would be foreclosed from that market, they submitted. Their distributive facilities, and particularly, their branch houses, had been displaced by the distributive depots of the chains, and could be used principally to serve the small independent retailers with both meats and groceries. In this market, according to the petitions, the defendants would be in competition with 6,000 well-established wholesale grocers with combined total sales of four billions of dollars annually. Upon information and belief, it was alleged that many of these wholesalers handled meats as well as groceries. Many, in addition, had developed important brands, and had branched into retailing and manufacturing. No danger of monopoly would result from the defendants' entry into the business of wholesaling groceries along with meats, it was claimed.

### Production.

The preceding decade had been marked, the petitions alleged, by the growth of a number of large firms and corporations engaged in the production, processing, and manufacturing of foods. Through mergers and acquisitions, these concerns had diversified to offer a wide range of products, many with significant brand names. The annual sales of the largest exceeded one hundred million dollars, and the average profits as a percentage of sales for seven of these large food concerns was 7% as compared with an average of 1.3% for the four defendant meat packers. Some of these food producers and manufacturers carried on their own distributing and wholesaling operations, and others maintained retail outlets as well. Several were engaged in meat packing or processing, and, the petitions continued, there were prospects of further mergers of meat packing and grocery manufacturing. Some of the defendants' competing meat packers, too, it was charged, had begun to deal in groceries. The defendants, however, were denied the opportunity of diversifying to avail themselves of economies in selling and distributing. Modification of the decree, they argued, would allow them to take advantage of modern marketing techniques, to help preserve the small independent retailer, to increase competition and thus to reduce prices to the ultimate consumer.

Upon these grounds, Swift and Armour prayed for modification of paragraphs Two, Three, Four, Five, and Six of the decree, so that they might own or retain interests in stockyards, terminal railroads, and stockyard newspapers and market journals, to allow them to deal generally in any non-meat grocery prod-

ucts and to make use of their distributive facilities in handling those products, and to sell meats through retail outlets.

Swift's petition asked in addition for relief from the prohibitions of paragraphs Seven and Eight of the decree, forbidding ownership of public cold storage warehouses and the handling of fresh milk and cream respectively. Concerning fresh milk and cream, Swift alleged that its procurement of raw milk for the manufacture of butter and cheese, permitted to the defendants by the decree, was impeded by the prohibition against dealing in fresh milk. Prices paid to farmers for milk to be resold fresh were higher, it was claimed, than the prices paid for milk to be used for butter or cheese. With the growth of cities, fresh milk dealers were extending their purchasing operations further into the rural areas, driving the defendants out of the market. The fresh milk prohibition also made it more difficult for the defendants to obtain eggs and poultry, as permitted, since the farm producers preferred to sell their poultry products to a purchaser who could also buy dairy products, and could sell them livestock feeds. Since the decree prohibited the defendants from dealing in fresh milk and cream or feeds, they were handicapped in permitted activities as well.

Neither The Cudahy Packing Company nor Wilson & Co., Inc., filed a petition for modication in these 1930 proceedings. Attorneys for both appeared in open court, however, to state that while they did not request modification, they would consent to any modication that might be ordered by the court, provided that it should be granted equally to all defendants.

Upon the government's general denial of the allegations of the Swift and Armour petitions, the matter was heard at length before Judge Bailey in the Supreme Court for the District of Columbia. At the conclusion, Judge Bailey ruled in opinion that the petitions should be denied in part and granted in part. The divorcement of all interest in stockyards, terminal railroads, and market

journals was still commanded because of the "many opportunities for secret preferences * * * and distortion" afforded by their control. On the other hand, because the combination among the defendants had been ended, and they had no monopoly, and because it is "an extreme measure * * * to prevent anyone from making an economic use of his facilities," the decree was modified to allow the defendants to employ unused space in their refrigerator cars and branch houses for handling the previously prohibited grocery items, and to allow the defendants generally to manufacture and deal in all commodities other than at the retail level.

As to retailing, however, Judge Bailey took a different view. "The control by the defendants of the great amount of interstate commerce in meats and other articles from the producer to the consumer would probably result in the almost complete annihilation of the independent retail grocer * * *," he concluded. To enter into the market, the defendants would have to buy out many retailers now in business, and would become competitors of present customers. Even the unused power to engage in retailing would present dangers of abuse, he noted. Since in his opinion to allow the defendants to integrate in this direction would be inconsistent with the Congressional policy to preserve and stimulate competition, Judge Bailey continued paragraph Six of the decree in full force and effect, to forbid the defendants to own or operate retail meat markets. For the same reasons, his modification of the prohibitions on grocery dealing did not extend to the retail level.

Swift's requests for relief from paragraphs Seven and Eight of the decree, enjoining the ownership of public cold storage warehouses and the handling of fresh milk or cream, were also denied.

In accordance with his opinion, Judge Bailey entered an order modifying the decree by confining the prohibitions of paragraphs Three, Four, and Five to retail dealing alone. The United States appealed from this order directly to the

United States Supreme Court. The intervenors, American Wholesole Grocers Association and National Wholesale Grocers Association, joined in the appeal to contest the modification. The defendants did not appeal, however, from that portion of the order which denied modification.

In an opinion that is the focal point of this litigation, the Supreme Court reversed the modification order and reinstated the original decree in full. United States v. Swift & Co., 1932, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999. Three of the Justices took no part in the decision. Of the remaining six, Justices Butler and Van Devanter dissented. The opinion for the majority of four was written by Justice Cardozo.

After this judgment of the Supreme Court was handed down in 1932, the decree took full effect without qualification for the first time since its entry. The defendants brought themselves into compliance by disposing of their interests in stockyard companies, terminal railroads, and market journals. The defendants divested themselves of their interests in concerns handling prohibited groceries and other items. Swift, for example, sold its substantial interests in Libby, McNeill & Libby. Retail meat markets were closed or sold to others. The defendants wound up their businesses in prohibited non-meat foods, and discontinued use of their distributive facilities in handling those foods. Forbidden interests in public cold storage warehouses were divested. In sum, the general grocery business was divorced from meat packing, and the defendants were divested of facilities and interests which were outside the scope of the meat packing business. The defendants thenceforth were confined in the main to purchasing livestock, slaughtering, dressing, processing, and distributing and selling meats and meat products at wholesale. They have continued to carry on the business of processing and dealing in the by-products of slaughter, including hides, hair and tallow. They have also engaged in the manufacture, processing, and sale

of grocery items not prohibited by the decree, including butter, eggs, oleomargarine, poultry, cheese, ice cream, dog food, lard, peanut butter, shortening, soaps and cleansers, salad and cooking oils, and foods containing vegetables in combination with meats. Beyond the food industry, Wilson & Co., Inc., has diversified heavily and successfully in the manufacture of sporting goods, and Armour in the field of chemicals.

### The Current Petitions.

The consent decree remained in force without further litigation for a period of twenty-four years after the Supreme Court denied the requested modification in 1932. In 1956, the current phase of the controversy opened when Cudahy filed its petition for modification of the decree in the United States District Court for the District of Columbia, successor to the Supreme Court for the District where the decree was entered. Later, in 1956, similar petitions were filed on behalf of Swift and Armour. No petition has been filed and no appearance has been entered on behalf of Wilson & Co., Inc., the other remaining defendant.

The three petitions were separately prepared and independently filed, but they are sufficiently similar in the substance of their content to permit combined summarization. The underlying theory of all three is the same as that relied upon in the 1930 petitions, that is, that the decree has become both unnecessary and unjust as a result of radical changes in the meat and food industries which have taken place since the earlier proceedings. As in 1930, the defendants submit that today they have no monopolistic control or dominant power in meats, and, even so, that it would be impossible today to wield any such power to achieve an anti-competitive position in the non-meat food industry. Again it is claimed that enormous and unforeseen technological and marketing changes have so altered the structure of the industry that the decree today no longer promotes the policies of the antitrust laws, but on the contrary restricts desirable competition.

With few exceptions, the changes relied upon in the current petitions are developments of the same kind and character considered in the 1930 modification proceedings. The trends of change have continued, and the differences are fundamentally matters of magnitude and degree.

Concerning monopolization or dominance in the meat industry, the petitioners repeat that the combination alleged in 1920 does not exist today. Their interests in stockyards, terminal railroads, and market journals have been divested, and the Secretary of Agriculture has assumed supervisory control of the operations of stockyards and of the dissemination of livestock marketing information. With the decline in importance of rail transportation and the increased use of motor trucks for shipping livestock, the competitive advantage flowing from the location of the defendants' large packing plants at the major rail centers has diminished, it is alleged, and an increasing volume of livestock is sold at smaller, scattered stockyards. As a consequence, the defendants' share of the total commercial slaughter has declined further since 1930, the petitions allege. At the same time, the number of competing meat packers has increased, many have gained the advantages of specialization by dealing in a single species of livestock, or by confining their operations either to slaughtering or processing alone. The sales of competing packers have increased more rapidly than the defendants', it is claimed, and these competitors, with lower fixed costs and modern facilities, have enjoyed a higher profit margin.

In the distribution of meat products, the petitions continue, the distributive facilities of the defendants no longer confer a competitive advantage. Refrigerated railroad cars, formerly owned almost exclusively by the defendants, have lost their significance as motor carriers have increased to offer a ready means of transporting meats of all packers. The defendants have reduced their use of rail transportation, and today own a markedly reduced number of refrigerated cars. Many have been retired from use, or sold to independent car operating companies.

The defendants' branch houses have diminished in utility and importance as well, it is alleged. Increased integration, mass selling, and the general availability of refrigerated storage space have altered marketing patterns, and today meat products are more and more shipped in large quantity directly from packing plants to the purchaser. As a result, the defendants have closed a number of branch houses, and the proportion of their total businesses handled through the branch houses has steadily declined.

The cumulative effect of these changes in the meat packing industry, according to the petitions, makes it impossible for any defendant to dominate the market.

As an alternative position, the present petitions, like the 1930 petitions, allege that the defendants' power in the meat packing field could no longer be used as an instrument of domination in other branches of the food industry, and therefore, the petitioners assert, there is no further need for the provisions of the decree which exclude them from dealing generally in non-meat foods and prohibit meat retailing. Again the present petitions repeat many of the claims made in 1930. It is said that the growth of large concerns at each level of the grocery industry has produced competitive conditions which eliminate any danger of monopolization by the defendants. At the retail level, the trend toward integration has continued. Chain stores, it is alleged, account for roughly half of the nation's food sales, and the growth of voluntary and cooperative chains has made them an almost equally powerful force. Their large financial resources and high profits as compared with meat packers gives them a competitive strength unmatched by the defendants. The development of the supermarket as the principal retail food outlet and the realization of the trend toward combination stores, handling both groceries and meats, have made diversification essen-

tial to effective competition at the retail level. Federal grading of meats and the increased use of private brands have tended to reduce the importance of national packers' brand names. Retailers generally, the petitions claim, have adequate alternative sources of meat, and are no longer dependent upon the defendants for their supply. No risks would be incurred under these conditions, it is said, by allowing defendants to retail groceries and meats.

At the wholesale level, the petitions allege, the technological developments have made wholesale grocers vastly more efficient and enhanced their competitive positions. Large, one-floor warehouses with machine loading and unloading, automated inventory controls, and pre-printed order forms permit wholesalers to handle vast quantites of groceries in wide variety at a low mark-up. In contrast, the defendants' branch houses are unfit for modern grocery handling, and would afford no overhead advantage in the distribution of groceries at wholesale. The experience of the defendants in marketing the non-meat products open to them under the decree demonstrates, it is claimed, that the defendants have not and could not tie groceries to meat and thereby employ any dominance in meats as a competitive wedge into the grocery market.

In the field of food processing and manufacturing, it is alleged, the years since 1930 have seen the growth of many concerns to a position of near equality, in value of assets, with Swift and Armour, and surpassing Cudahy. Widely diversified, these companies employ extensive advertising programs and scientific promotional techniques, and make use of new and improved methods of processing, packaging, distributing, and displaying their products.

Concerning the provisions of paragraph Eight, the defendants claim that the prohibition against dealing in fresh milk or cream has produced unexpected hardship in the conduct of the permitted butter, cheese, and ice cream business, as a result of government milk marketing controls.

The decree therefore is claimed to place the defendants at an unwarranted competitive disadvantage. Profits in meat packing are among the lowest in the food industry, and the defendants are deprived of profit-making opportunities by their exclusion from the areas of greater return. As a result, the defendants have sustained losses since the entry of the decree, and have suffered by reason of this inequitable treatment.

On these grounds, the three petitioners seek modification of paragraphs Three, Four, Six, and Eight of the decree, to allow dealing in groceries and dairy products without restriction at all levels of the market, to allow re-acquisition of interests in grocery concerns, and to permit them to sell meats at retail. In short, they seek vacation of the heart of the decree. Of the nine paragraphs of the original injunction which imposed substantive prohibitions, five would remain in force. Two of these, paragraphs One and Nine, are general in their terms, and amount to no more than admonitions to obey the law. Paragraph Two, forbidding ownership of stockyards, terminal railroads, and market news journals, would remain in force, but would add little of substance to the regulatory control now exercised by governmental agencies. Paragraph Seven forbids the defendants' ownership of public cold storage warehouses. Cudahy alone has requested modification of this restraint. And on behalf of E. A. Cudahy, Jr., alone, a request is made for the modification of paragraph Five, which prohibited each of the individual defendants personally from owning a controlling interest in any company or concern dealing in the grocery commodities prohibited to the corporate defendants.

To these petitions, the government filed an answer denying generally the factual allegations, and affirmatively setting up the 1932 decision of the Supreme Court, denying modification, as *res judicata*, or alternatively, as precluding re-litigation of matters which occurred before 1930.

The answer, in conclusion, sets up the claimed insufficiency of the allegations of the petitions, both legally and factually.

In 1958, the cause was transferred upon the motion of the defendants under Section 1404(a) of the Judicial Code, 28 U.S.C. § 1404(a) (1948), from the District of Columbia to this court, 158 F. Supp. 551. The government's motion for summary judgment was denied by Judge Miner of this court for lack of a showing that a full hearing was unnecessary. A petition for leave to intervene was presented on behalf of Western States Meat Packers Association, Inc., and Texas Independent Meat Packers Association, two organizations representing smaller packers, and on behalf of four small meat packing companies. The petition for intervention was denied, and instead the applicants were given the right to submit a written brief as *amici curiae* and to participate in the oral arguments after the close of the evidence.

### Questions Presented.

The voluminous record and extensive arguments in these proceedings reveal few sharp disputes of fact. In general, the parties are agreed upon the statistical information presented, and upon the observable facts which describe the structure and patterns of the food industry today. The factual portion of the controversy is therefore concentrated upon the conflicting inferences which might be drawn from the admitted facts, the question of the characterization of prevailing market conditions, and the application of the standards, tests, and measures for the modification of an equity decree entered upon the consent of the parties. The conflict is concerned more with the significance of facts than with their existence.

The disagreement upon matters of law is also narrow. All the parties are agreed that the decision of the Supreme Court upon the appeal of the earlier modification proceeding is controlling in large degree here. They disagree, however, upon the manner in which that decision controls and upon the extent to which it is dispositive. The parties also disagree upon the proper interpretation of the Supreme Court's opinion in the prior appeal, concerning the test laid down for modification. Upon this question of the reading of Justice Cardozo's opinion for the majority, the petitioners disagree not only with the government but with each other as well.

### The Effect of the Swift Decision.

██ Turning first to the legal question of the effect of the Supreme Court's decision regarding the prior petition, reported as United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999, it is conceded without dissent that the opinion provides a direct precedent for this proceeding. In the years since its rendition, the decision has attained the position of a leading case in the field. It has been cited as authoritative in more than one hundred subsequent decisions, both in the lower courts and by the Supreme Court itself. Nothing has been decided since to cast doubt on its continued vitality or to limit its scope. Under the principles of *stare decisis*, basic to our legal system, its force must be heeded. The obligation of obedience is heightened by the fact that the decision was rendered by the highest court in the land. In the hierarchical structure of the federal judiciary, the District Courts are bound by the law as declared by the Supreme Court. We are not free to disagree, to disregard in the guise of reinterpretation, or to speculate upon probabilities or personalities. "In any event, the District Courts as well as the Courts of Appeals must follow the decisions and interpretations of our highest court in spite of any individual predilections that may exist." United States v. Chase, 7 Cir., 1960, 281 F.2d 225, 229.

But the Swift decision is more than a well-reasoned case in point for this proceeding. The opinion was handed down in the very case now to be decided. In reversing the lower court's order and remanding the case to the District Court, the United States Supreme Court gave specific directions to govern the further

course of the proceeding. The circumstances offer no leeway for departure from those directions.

■■ The determination of the trial court in the 1930 proceedings, the Supreme Court for the District of Columbia, is entitled to deference as well. To the extent that Judge Bailey's findings were not put before the United States Supreme Court because the petitioners there did not cross appeal, his determinations stand as final and conclusive for that proceeding. Under the doctrine known as the law of the case, the unreversed decision of a question of law or fact made during the course of litigation settles that question for all subsequent stages of the suit. See J. C. Millett Co. v. Distillers Distributing Corp., D.C.N.D. Cal.1960, 185 F.Supp. 874. Orderly and consistent progress of the case requires that the parties be precluded, with rare exceptions, from re-opening and re-arguing matters already decided.

■■ On behalf of Cudahy, it is argued that the effect of the 1930 proceedings is qualified by the fact that Cudahy did not then petition for modification and did not participate in the trial court hearing or in the appeal. Therefore, it is said, Cudahy is not bound by the decisions rendered either by the Supreme Court or the trial court. From the record it appears that an appearance was entered on behalf of Cudahy in the 1930 proceedings solely to state that while it did not seek modification of the decree, it would consent to such modification as the court might order, provided that it be made applicable to all the defendants. Accepting this position, Judge Bailey entered an order modifying the decree as to all defendants, including Cudahy, and the Supreme Court's reversal reinstated the decree as to all.

Cudahy's position amounts to an attempt to eat the cake and have it, too. It sought to share in the benefits resulting from the efforts of Swift and Armour to modify the decree, while claiming to be free of the burden of an adverse determination. Had Judge Bailey's order stood unreversed, Cudahy would have gained. With the appeal lost, however, Cudahy claims no prejudice, and asserts the right to re-litigate the questions. As a general rule, a person who allows another to represent his interests in litigation is bound by its conclusion to the same degree as the parties of record. See Restatement, Judgments § 85, pp. 402–3 (1942). It is unnecessary to decide that Cudahy is bound under this principle to the same extent as Swift and Armour, however. The Supreme Court's decision in the prior appeal stands as the authoritative declaration of the principles which must control the disposition of Cudahy's petition. In these circumstances, whether this court's duty of obedience is based upon doctrines of *stare decisis* or upon the more direct command of the rule of the law of the case is of no consequence. In either event, Cudahy is bound by the Swift decision.

■■ Not content to rely on the Supreme Court's decision as declaring the applicable rules for this proceeding, the government in its answer and briefs has claimed that the decision raises the bar of *res judicata* against the present petitions. The government thus invokes the settled rule that a claim or cause of action once litigated between the parties may not be re-litigated between them. See Cromwell v. County of Sac, 1876, 94 U.S. 351, 24 L.Ed. 195. If accepted, the argument would mean that once having requested modification and lost, the defendants would be forever barred from seeking modification in the future. The specific reservation of jurisdiction to modify contained in paragraph Eighteen of the decree would lose much of its meaning. An equity decree of the kind here involved looks to the future. In this respect it is unlike the typical judgment in an action at law, which determines rights arising from the fixed facts of a transaction past and closed. In contrast, the essential characteristic of the equity decree is its flexibility and its responsiveness to changed conditions. So far as it depends upon completed occurrenc-

es, the injunction is conclusive, but in its prospective application the decree is always open to reconsideration. The petitioners are not barred, therefore, from requesting modification anew. In the Swift decision itself, the principles were laid down by Justice Cardozo:

"A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need. [Citations omitted.] The distinction is between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative." 286 U.S. at page 114, 52 S.Ct. at page 462.

▬ As an alternative to its claim of *res judicata*, the government invokes the related doctrine of collateral estoppel to limit the scope of the issues in this proceeding. Collateral estoppel supplements *res judicata* and applies to prevent the re-litigation of issues of fact or law previously decided between the parties. See Polasky, Collateral Estoppel, 39 Iowa L.Rev. 217 (1954). The doctrine comes into play when the absolute bar of *res judicata* does not obtain. Unlike *res judicata*, collateral estoppel extends not to all claims, defenses, and issues that might have been raised by the parties, but only to those issues actually contested and decided. Applied here, the doctrine would foreclose re-litigation of questions of fact and law decided in the 1930 proceeding. The government argues upon this basis that the petitioners are limited in their showing to changes in conditions which are different "in kind or character" from the changes considered in 1930, and asserts that mere continuation of trends begun in the decade of the 1920's cannot be considered. The underlying question, however, is the identification of the issues litigated and decided in those proceedings. Changes found by the court to exist as a matter of fact and decided as

a matter of law to be insufficient must be rejected as insufficient here. Changes not considered in 1930 are open to independent consideration now. The government's argument supposes that change has a single dimension, and that nothing is added by an increase in magnitude so long as the direction of change remains the same. The argument presses too far. The decision in the earlier proceedings establishes conclusively that the changes proved by the evidence then before the court do not suffice for relief from the decree. To the extent that the evidence proved not only changes then already complete, but in addition changes reasonably certain to accrue in the future, and to the extent that the court accepted the prediction as fact but rejected it as grounds for modification, the fulfillment of the prophecy adds nothing. On the other hand, the continuation of a trend of economic change deserves consideration here if the degree of change was not anticipated in the 1930 proceedings, and therefore was not the subject of decision.

▬ The doctrine of collateral estoppel presupposes a final judgment between the parties. When as here the subsequent proceeding constitutes a continuation of the same case, the controlling principle might more accurately be termed the law of the case. In either event the consequences are the same. What has been said serves also to dispose of a corollary argument of the government, that changes which occurred between the entry of the decree in 1920 and the hearing upon the prior petitions in 1930 cannot be cumulated with changes which have occurred since 1930 to justify modification. But the Court in 1930 did not decide that the changes up to that time had no force or significance whatever. It held only that those changes did not satisfy the requirements for modification of the decree. Those changes did not amount to nothing; there were rather not enough. In determining whether a case for modification has been made, then, the starting point is the entry of the decree itself, and all

subsequent change must be measured against the applicable standard. The 1930 decision operates as a bench mark and not as the base.

### The Test for Modification.

The power of this court to modify the decree, reserved by the decree itself and declared in the Swift decision, 286 U.S. at pages 114–115, 52 S.Ct. at page 462, is conceded and not in dispute. That it was entered upon the consent and agreement of the parties does not make it a contract between them. The injunction is nonetheless a judicial act, subject to alteration as a decree entered after litigation would have been. The parties are in disagreement, however, concerning the test by which the grounds for requested modification must be measured.

At the outset, it is clear that the test is not that which controls the issuance of an original decree. This court is not at liberty to substitute its judgment upon the question whether the injunction as entered in 1920 was in accord with equitable principles under the circumstances then prevailing. The decree was accepted by the defendants, and the Supreme Court has twice held that they are not free to attack it. Swift & Co. v. United States, 1929, 276 U.S. 311, 48 S.Ct. 311, 72 L.Ed. 587; United States v. Swift & Co., 1932, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999. The petitioners' reliance upon decisions regarding the appropriate scope and function of an equity decree, in cases where those questions are open to consideration, is therefore misplaced. And for this reason the observations of this court in United States v. National City Lines, D.C.N.D.Ill.1955, 134 F.Supp. 350, have no application.

The initial inquiry, all concede, is whether the original need for the decree still exists. As stated for the Court by Justice Cardozo, the question is whether "dangers, once substantial, have become attenuated to a shadow." 286 U.S. at page 119, 52 S.Ct. at page 464. It bears repeating, however, that the test is not

whether this court would issue the existing decree as an original matter under the circumstances which obtain today. The decree is above impeachment, and if present-day conditions are substantially the same as conditions in 1920, to modify would be to reverse. It is our duty to ask not whether the decree is needed today, but whether if it was needed in 1920, the intervening changes have eliminated that need.

The parties are in disagreement upon the further inquiry directed by the Supreme Court's test for modification. Justice Cardozo, in the introductory portion of his opinion regarding the power to modify, remarked that a court in entering a consent decree "does not abdicate its power to * * * modify its mandate, if satisfied that what it has been doing has been turned through changing circumstances into an *instrument of wrong*." 286 U.S. at pages 114–115, 52 S.Ct. at page 462. Later in the opinion, after discussing the question of need and concluding that need still existed, Justice Cardozo remarked, "No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned." 286 U.S. at page 119, 52 S.Ct. at page 464.

The parties are irreconcilably at odds in their interpretation of these pronouncements. Petitioners take the position that the Supreme Court meant to say that the absence of need and the existence of hardship are alternative routes to modification. In their view, a decree should be modified if it is no longer necessary to safeguard the public interest or, even if protection is still needed, if the decree inflicts hardship upon the defendants as the result of changed conditions. The government in opposition seems to argue that both the absence of

need and the presence of grievous hardship must be shown to warrant modification. Again, in its brief, the government appears to regard hardship as a subsidiary issue in the application of the test of continued need. In this view, apparently, need must be regarded as continuing so long as the defendants have not undergone any major substantive change; if they have been weakened by hardship, the need would be diminished.

Neither party's reading of Justice Cardozo's language comports entirely with the objects of equity jurisdiction in antitrust enforcement. The underlying policy is protection of the public interest in competitive economic activity. The equity decree is not an instrument of punishment; the infliction of penalties may be sought where appropriate through criminal proceedings. Protection for the public is therefore to be achieved so far as possible without visiting unnecessary hardship upon the defendants. Here, as elsewhere, the use of equity power requires that a balance be struck between the interests of the public and of the defendants. "The qualities of mercy and practicality have made equity the instrument for nice adjustment and reconciliation between the public interest and private needs as well as between competing private claims." Hecht Co. v. Bowles, 1944, 321 U.S. 321, at page 329, 64 S.Ct. 587, at page 592, 88 L.Ed. 754. In this light, the continued need for the decree and the hardship suffered by the defendants are neither alternative standards for modification, either of which will suffice, as the defendants submit, nor cumulative prerequisites, both of which must be established, as the government claims. They are rather correlative elements of a single standard. As need is diminished, a lesser showing of hardship will tip the scales in favor of modification, and as the defendants' suffering increases, their burden of showing decreased need is correspondingly lightened.

There is nothing to alter or limit these principles to be found in Ford Motor Co. v. United States, 1948, 335 U.S. 303, 69 S.Ct. 93, 93 L.Ed. 24, or in Chrysler Corp. v. United States, 1942, 316 U.S. 556, 62 S.Ct. 1146, 86 L.Ed. 1668. In both, the government had sought modification of a consent decree to extend its operation. In the Chrysler case, the modification was allowed upon the ground that it effectuated the basic purpose of the consent decree, in reliance upon the Swift decision. In the Ford case, a similar request for modification was denied.

Recent decisions in the District Courts have applied the test vigorously to deny modification of consent decrees. See, for example, United States v. Owens-Corning Fiberglas Corp., D.C.N. D.Ohio 1959, 178 F.Supp. 325; United States v. International Boxing Club of New York, Inc., D.C.S.D.N.Y.1959, 178 F.Supp. 469.

The generalized language of Rule 60(b) (5) of the Federal Rules of Civil Procedure, 28 U.S.C.A., promulgated since the Swift decision, does not alter the test. The Rule authorizes relief from a decree when "it is no longer equitable that the judgment should have prospective application." There is nothing in the Rules, their history, or their commentary to suggest that the words were intended to do more than to adopt the standard evolved in Swift and other decisions.

In determining whether changes in economic conditions since the entry of the original decree have occurred in a degree to meet this test, the developments must be viewed in a frame of reference. As Justice Cardozo observed, "Life is never static * * *." [286 U.S. 106, 52 S.Ct. 464.] Change is inevitable, but it is only change that reaches the underlying reasons for the decree that is relevant. Conditions existing at the time of original entry must be compared with conditions at the time of requested modification, and the significance of the difference measured in the light of these original reasons. The fact that a decree is entered by consent rather than upon litigation does not deprive the court

of power to modify, as the Supreme Court declared. 286 U.S. at page 114, 52 S.Ct. at page 462. The difference has a profound effect, however, upon the task of the judge in ruling upon a request for modification. Here no evidence was introduced to supply a factual foundation for the restraints. No findings of fact were made, and no opinion was delivered to explain the legal purposes of the decree. Any attempt to determine now exactly what facts existed in 1920 would be difficult at least, and even if it were possible, the process would involve a trial of issues which the parties solemnly agreed need not be tried. It is likely that in the negotiations leading to the compromise, each party proceeded upon different factual information and presuppositions. These facts are not necessarily those that would have been found had the case been litigated in 1920, and certainly not those that would emerge from a 1960 trial of 1920 conditions.

The decree here in issue bears traces of compromise. For example, the complaint demanded that the defendants be divested of their instruments of monopoly, including not only stockyards, terminal railroads, and market news journals, but refrigerator cars and branch houses as well. The decree as entered allowed the defendants to retain these distributive facilities for meat products. Again, the complaint demanded an injunction against the defendants' dealing in nine named classes of non-meat foods, but the decree permitted them to continue to handle four of these nine classes. The defendants were allowed peanuts but denied other nuts; they were allowed cigarettes but not cigars; and they were allowed butter and cheese but not fresh milk and cream.

To a degree, therefore, the factual foundations for the injunction and the reasons supporting it must rest in conjecture. The task of decision is doubly hypothetical since an unknown past must be compared with a speculative future, involving a prediction of what action the petitioners might take if the decree were relaxed. Nonetheless, if modification is to be possible without impeachment of the decree, its reasons must be identified from the best evidence available. At the same time, unless the solemn judicial act taken upon the considered consent of all the parties is to be stultified, the decree must enjoy a solid presumption that it was founded on fact and supported by reason.

█ The petitioners therefore bear the burden of proof on their petitions, and the burden is heavy. They have no standing to complain, as they have argued, that the government has failed to show any palpable threat of future violations of law on the part of the defendants. The burden on the issue is theirs. Nor is it enough to assert, as they have, that the prohibited activities are not unlawful. They must go further and show that the decree when entered was supported by conditions which have so altered with the passage of time that the restraint can no longer be justified, and that they are suffering injury, without counterbalancing advantage to the public interest, sufficient to move a court of equity to act. It is of no avail to argue, as they have, that the antitrust laws, including revised Section 7 of the Clayton Act, 15 U.S.C.A. § 18, concerning mergers, and the Robinson-Patman Act, 15 U.S.C.A. §§ 13–13b, 21a concerning predatory price-cutting, now provide ample remedies for future violations. The public now enjoys the specific protections of a decree. The defendants' contention that the general law also forbids the conduct would be equally available to prevent the issuance of any injunction against future conduct, and would render the equitable remedy largely nugatory.

The petitioners' burden is heavy, but it is not therefore unfair. Its effect in practice may be to perpetuate a decree that was unwarranted from the beginning. The defendants' mistake in giving consent will remain beyond recall until the decree operates to oppress them in ways uncontemplated at its issuance, or until circumstances have so changed that the foundations of the decree, whether

adequate or not, are completely undermined. The way of escape is narrow. A broader avenue would destroy the utility of consent decrees. If a composition reached after full and deliberate consideration may be set for nought simply because one of the parties on second thought believes he would have fared better at a trial, the decree becomes nothing more than a continuance or postponement of the trial, and the mutual benefits which induce this form of disposition will be lost.

In the conferences that led to the decree, the defendants were not untutored innocents at the mercy of an overweening government. The evidence of compromise in the decree suggests their power to bargain. They gained significant advantages through their consent. They were spared the expense, burdens, and publicity of a full trial, and avoided the risk of more drastic relief that might have required division of their gigantic operations. Unlike a litigated decree, the consent decree would not serve as the foundation for private antitrust suits.

A consent decree is a double shield, protecting the defendant as well as the public. E. g., Ford Motor Co. v. United States, 1948, 335 U.S. 303, 69 S.Ct. 93, 93 L.Ed. 24. Indeed its use has been criticized as immunizing the defendants' unlawful conduct in cases where the government representatives unwisely accept less than the public interest demands. See Dabney, Antitrust Consent Decrees, 68 Yale L.J. 1391 (1959). These very defendants were some years ago the direct beneficiaries of the decree they now attack. When in 1948 the government filed a new suit, seeking dismemberment of the individual defendants' meat packing businesses into competing enterprises, the defendants sought and obtained a ruling from the trial judge that, because of this consent decree and its subsequent proceedings, no evidence relating to occurrences or conditions before the 1930 modification proceedings could be received. United States v. Armour & Co., Civ. No. 48 C 1351 N.D.Ill., Sept. 15, 1948. Faced with this handicap, the government felt obliged to dismiss its suit.

The defendants can gain nothing from the recital in their stipulations to the decree that they consented upon condition that its entry should not be considered an admission or the decree an adjudication that they had in fact violated any law of the United States. By their consent, they relinquished the right to insist that an offense be proved, and the right to show that no violation had been committed. Having accepted a decree drawn on the theory of a violation of the antitrust laws, they cannot now vacate or modify the decree on the ground that the theory was unsound. Swift & Co. v. United States, 1929, 276 U.S. 311, 48 S.Ct. 311, 72 L.Ed. 587. The decree is entitled to every presumption necessary to sustain it.

To determine whether the changes relied upon by the petitioners meet the Swift test, it is necessary first to identify the reasons underlying the original decree, since it is these reasons which lend relevance to change.

The petitioners agree in the position that a principal reason for the provisions here in issue, prohibiting and dealing in a proscribed list of grocery items and the operation of retail meat markets, was the defendants' ownership and control of a nationwide system of distributive facilities. It appears to be Swift's position that the distributive facilities supplied the *only* foundation for these portions of the decree.

The petitioners' argument is based upon the remarks of Justice Cardozo in the Swift opinion that:

> "Two reasons, and only two, for exacting the surrender of this adjunct of the business, were stated in the bill of complaint. * * *

> "The first was that, through the ownership of refrigerator cars and branch houses, as well as other facilities, the defendants were in a position to distribute substitute foods and other unrelated commodi-

ties with substantially no increase of overhead. \* \* \*

"The second reason stated in the bill of complaint is the practice followed by the defendants of fixing prices for groceries so low over temporary periods of time as to eliminate competition by rivals less favorably situated." 286 U.S. at pages 115, 116, 52 S.Ct. at page 462.

Swift takes the position that the second reason stated, the defendants' price cutting, is merely subsidiary to the first, since the overhead advantage conferred by the distribution system alone permits such price cutting. Thus Swift argues, and Armour and Cudahy concur with qualifications, that the decline in the defendants' distributive systems, through the closing of branch houses and disposal of refrigerated railroad cars, is sufficient of itself to require granting of the requested modification.

The argument fails to give weight to two significant qualifications which Justice Cardozo took care to state. First, the reasons are said to be the only two "stated in the bill of complaint." From the nature of the subject matter, pleadings in antitrust cases are necessarily general and conclusory. Swift & Co. v. United States, 1905, 196 U.S. 375, 25 S.Ct. 276, 49 L.Ed. 518. The government is not obliged to set forth all the reasons upon which it relies, and the fact that any appeared was largely fortuitous. Since these reasons were obvious and sufficient to dispose of the appeal, it was unnecessary to look further. But as Justice Cardozo recognized later in the course of the opinion, there is nothing to confine the court to the complaint in seeking the reasons for the decree.

Justice Cardozo's second qualification was that these reasons applied to the adjunct of the decree before him. Since Judge Bailey had denied all the defendants' requests except for the modification of paragraphs Three and Four, and since the defendants had not cross-appealed, the only portions of the decree before the Supreme Court were those forbidding the defendants to handle the grocery items on the proscribed list through their branch houses and refrigerator cars or otherwise at wholesale, or to produce or manufacture these items. The cost advantages of distributing groceries with meats were enough to support the original decree in these aspects. But these reasons would not support the provisions of paragraph Six of the decree, prohibiting the ownership or operation of retail meat markets, as the defendants have recognized in their argument that the complaint states no reasons for this restraint. It is an independent restriction, unrelated to any economies of joint distribution. Moreover, the defendants were left free to make full use of their distributive facilities for the purposes for which they were designed and best fitted, the distribution of meat at wholesale. Finally, there is no policy that can be gleaned from the antitrust laws to prevent a businessman, without more, from taking full advantage of economies in his operations. It is apparent, then, that we must look further for the reasons behind the decree.

The decree itself contains internal evidence of more fundamental reasons. Paragraph Three prohibited use of the defendants' branch houses, refrigerator cars, and other facilities for the distribution of prohibited non-meat foods, either on the defendants' own account or for others. Paragraph Four separately and independently prohibits the defendants from dealing in its specified list of grocery items in any manner, and from owning any interest in a concern engaged in this prohibited business. As Justice Cardozo recognized in his opinion, the several paragraphs of the decree impose independent restrictions, each of which must be complied with. The defendants were not offered the option of observing one or some of the restraints, and compliance with some of the prohibitions was not to excuse obedience to the remainder. Applying this rule of interpretation to paragraphs Three and Four, it is clear that the prohibition

against the defendants' grocery dealing was not dependent upon use of the distributive facilities for the purpose. The basic purpose was rather to divest the defendants of their grocery businesses, and to establish the grocery and meat operations as separate enterprises. In this light, the prohibition against the use of distributive facilities becomes, in the language of Justice Cardozo, "merely ancillary" to the general restraint. 286 U.S. at page 113, 52 S.Ct. at page 462.

Some of the defendants concede that "past aggressions" and the defendants' disposition to commit them, as mentioned by Justice Cardozo, form an additional reason for the decree. See 286 U.S. at pages 117, 118, 119, 52 S.Ct. at pages 463, 464. Modification now is warranted, they assert, since the individual officers who formerly controlled company policies are no longer in power, and since the defendants have remained law-abiding for a substantial period of time. If the argument is accepted, the reasons for the decree are not exhausted. Price cutting and unfair trade practices can be employed as well in the lines of business left open to the defendants as in the prohibited fields. The reason would not, therefore, explain the provisions of the decree here in issue, and changes eliminating that reason would not by the same taken eliminate the need.

The underlying purpose appears from the observations of the opinion of Justice Cardozo:

"Mere size, according to the holding of this court, is not an offense against the Sherman Act unless magnified to the point at which it amounts to a monopoly [citations omitted], but size carries with it an opportunity for abuse that is not to be ignored when the opportunity is proved to have been utilized in the past. The original decree at all events was framed upon that theory. It was framed upon the theory that, even after the combination among the packers had been broken up and the monopoly dissolved, the individual units would be so huge that the capacity to engage in other forms of business as adjuncts to the sale of meats should be taken from them altogether. * * * To curb the aggressions of the huge units that would remain, there was to be a check upon their power, even though acting independently, to wage a war of extermination against dealers weaker than themselves. * * * Groceries and other enumerated articles they were not to sell at all, either by wholesale or by retail. Even the things that they were free to sell, meats and meat products, they were not to sell by retail." 286 U.S. at pages 116–117, 52 S.Ct. at page 463.

As the largest meat packers in the nations, with a total market share of more than half, the defendants occupied a dominant and commanding position in the meat industry. As alleged in the complaint, they had achieved their positions of dominance and their gigantic size through unlawful combination and restraint of trade. To avoid rewarding them for past misdeeds, the defendants were to be restricted in the use of the vast power they had acquired. They were prohibited from taking advantage of the dependence of others for meat and meat products, and were forbidden to employ their overwhelming financial resources and established positions as instruments to extend their power into other markets. They were dismembered by the separation of their retailing activities and their grocery businesses. The separation, once complete, was to continue. So long as the power endures, therefore, the divestiture must be maintained, and the defendants forbidden to re-acquire what they were ordered to give up.

It is futile to question whether these reasons could have been established had the defendants insisted on their right to a trial of the issues, or to speculate upon whether the government could more readily agree to alteration of consent decrees without compromising the public interest. The court's function is limited

to the determination of the issues put before it, in accordance with the principles laid down by the Supreme Court.

### Changed Conditions.

 Under the test for modification laid down by Justice Cardozo and in the light of the stated reasons for the original decree, the evidence of economic change presented by the petitioners must be evaluated.

### *Dominance in Meat Packing.*

The evidence establishes clearly that the four defendant meat packers today are engaged in active competition with each other. The combination charged in the 1920 complaint and the restraints of trade agreed to in furtherance of the combination have been brought to an end. The defendants' control of livestock marketing has been relinquished through the sale of their interests in public stockyard companies and appurtenant facilities in stockyard terminal railroads, and in livestock journals and market newspapers. Resumption of control would be prevented by the supervisory powers of the Secretary of Agriculture under the Packers and Stockyards Act of 1921, and by the widespread dissemination of accurate and timely livestock market reports through the programs fostered by the Department of Agriculture. These changes had taken place, however, before 1930, and were considered by the courts in rejecting the earlier petitions of Swift and Armour for modification of the decree.

Since the entry of the original decree, the advantages flowing from the location of the defendants' large packing plants at the nation's chief rail centers have diminished. At the entry of the original decree, more than half of all species of livestock was marketed at eleven terminal stockyards. The proportion declined during the ensuing decade, and with the decreasing importance of rail transportation the number of markets has increased and livestock selling has been decentralized. Despite this trend, however, the petitioners Swift and Armour have managed to increase the number of livestock purchased and slaughtered substantially. In 1920, Swift slaughtered 13,235,000 head, and in 1956, the year its petition was filed, 22,847,000. The corresponding slaughter by Armour was 14,853,000 in 1920 and 19,433,000 in 1956. Cudahy's total slaughter rose from 4,028,000 to 5,596,000 in 1950, when a period of decline began. In 1956, Cudahy's total slaughter of all species was 2,958,000 head. In the slaughter of hogs, however, Cudahy's total for 1956 of 2,196,000 slightly exceeded the 1920 figure of 1,932,000. During the period the four defendants' combined share of the total commercial slaughter of the United States has declined from 47% to 38%. Swift's share stood at approximately 17% both in 1920 and in 1956, while Armour's share declined from 19% to 14.5% and Cudahy's from 5.1% to 2.2%.

Since 1930, the defendants' distributive facilities have undergone change. In 1929, the three petitioners owned a total of 933 branch houses for the storage and distribution of meats and other products. As they conceded, some of these facilities were provided for the purpose of handling groceries along with meats, and their capacity in some degree exceeded the needs of the meat business. With the enforcement of the decree after the Supreme Court's decision in 1932, these branch houses lost some of their utility. With the increased development of volume buying direct from packing plants, the branch houses were gradually reduced in number and efficiency. Swift maintained 430 in 1929, and 270 in 1956. Armour reduced its number from 402 in 1929 to 213 in 1956. Cudahy maintained 101 in 1929, 51 in 1950, and only 11 in 1959. Although a decreasing percentage of the defendants' total meat sales are made through the branch houses, they are still significant factors. For example, in 1956 Armour effected total sales of over one billion dollars through its branch houses, or nearly 50% of its total sales.

The defendants have drastically reduced their ownership of refrigerated railroad cars, and today rely principally upon leased cars, common carriers, and refrigerated trucks for transporting their meat products. No petitioner owns a significant share of the available means of transportation today. The increase in the cold storage facilities of both retailers and wholesalers has made the defendants' provision of extensive refrigerated shipping and storage space unnecessary.

The quantity of meats sold under the private brands of chains, wholesalers, and retailers has increased, and the growth of federal meat grading programs since World War II has tended to widen the markets open to the small competing packers. The defendants still rank as leading meat packers, whose names and products are nationally known, and they spend substantial amounts in advertising to assure continued consumer demand. Since 1930 they have doubled the dollar volume of total sales. Swift's sales increased from approximately one billion dollars at the time of filing the 1930 petition to nearly two and one-half billion dollars at the time of filing the present petition. Armour's sales increased at the same time from one billion dollars to two billion dollars, and Cudahy's from $268,000,000 to $583,000,000 in 1950. With the decline in Cudahy's business that began in 1950, its sales fell to $291,000,000 in 1956. As a percentage of the meat industry's total sales, the defendants lost ground from their combined total share of 63% in 1930. Still in 1956 they enjoyed a combined 47%. Under competitive pressure, the petitioners have processed a decreasing share of their slaughter, however, relinquishing a more profitable aspect of the business. Thus their sales of uncured hams and so-called green bellies to others for processing have increased in recent years.

As in 1930, the evidence shows the petitioners have operated on the low return of profits as a percent of total sales and as a percent of net worth that characterizes the meat industry generally. In general, their profits have been somewhat below the average of their smaller competitors.

Today the defendants in combined totals own assets in excess of one billion dollars, over half the value of the assets of the entire meat industry. They account for nearly half the nation's meat sales. They slaughter nearly 40% of the commercially slaughtered livestock in the nation. The petitioners remain, to the extent that they were in 1930, the dominating forces in the meat industry. While Cudahy, the smallest of the three, has declined in recent years, it remains one of the nation's largest packers, exceeded by a wide margin only by Swift and Armour, and equalled in approximation only by five competitors.

### Changes in the Food Industry.

The petitioners argue that any power which they might retain in meat packing could no longer be carried into other branches of the food industry in view of the enormous changes that have occurred since the entry of the decree. Large and powerful competitors exist in every branch and level, it is said, to counter the power of the petitioners.

In 1930, Judge Bailey denied the petitioners' request to enter the business of retailing meats and groceries on the ground that their entry would imperil the independent retailer and that the very existence of the power to enter would create dangers of abuse. Since that time the strength of the chains has continued to increase. In 1930, chains of all three kinds (corporate, voluntary, and cooperative) accounted for 60% of grocery sales, and today the figure has risen to 75%. Although the supermarket development had begun by 1930, it has accelerated rapidly until today approximately 74% of all grocery store sales is made by supermarkets, and an even higher percentage of meats is sold in so-called combination stores, handling both meats and groceries. Under mod-

ern marketing conditions, it would be impracticable for the defendants to engage in the business of selling either groceries or meats alone at retail. If the defendants were to engage in the business of operating general retail food stores, they would enjoy a substantial advantage over their rivals as a result of their control of nearly half the nation's meats and meat products. Vertical integration through acquisition of existing retail stores or chains would tend to restrain competition by providing the defendants with captive outlets for both their meats and groceries, to the exclusion of competitive products. If, as the petitioners argue, they need the right to experiment in retail marketing techniques to preserve their consumers' acceptance, other methods of marketing research are available.

Concerning the petitioner's request to enter into the business of grocery wholesaling, it appears from the evidence that their existing distributive facilities would not afford any substantial advantage in the distribution of groceries along with meats. The branch houses now in use for meats are not adaptable for the handling of the large quantities of grocery items required by modern retail outlets. The permitted grocery items sold by the defendants are being distributed to an increasing degree independently of meats, through separate units of the business. Although groceries are commonly bought and sold separately from meats today, the situation resembles that which prevailed before the development of the combination store. Retail outlets are increasingly integrated with wholesalers, and centralized buying of meats has increased, with corporate chains purchasing practically all of their meats under group buying arrangements. Approximately 106 of the 704 voluntary and cooperative chains have group meat buying programs. If the defendants were permitted to sell groceries and fresh milk and cream at wholesale along with their meats, the competitive advantages of offering a full line of products and the economies resulting from large volume and combined managerial and sales staffs would afford the defendants a competitive advantage similar to that which has largely eliminated the butcher shop, the green grocer, and the bakery shop from the retail trade.

Applying the tests dictated by the Swift decision, it must be concluded that the petitioners have failed to discharge the burden of establishing that the dangers, if they once existed, have been "attenuated to a shadow" by changed circumstances.

On the correlative question of hardship, it is not enough that the petitioners' profits have been modest, or that other concerns in the food industry have enjoyed greater returns and more rapid growth. To the extent that the petitioners' hardship is only the denial of the opportunity to diversify into more rewarding branches of the food industry, the burden is not new or unforeseen, but was specifically contemplated in the framing of the decree. Moreover, none of the defendants' competitors, either in meat packing or in grocery manufacture or processing, has diversified to any substantial degree to combine meats and other foods. To the extent the defendants' difficulties, and particularly those of Cudahy, are attributable to causes other than the decree, they may bear on the question of the continued need for the decree, but do not establish hardship in the sense required by the Swift decision.

### Conclusion.

It has been said that the decree itself offends the policies of the antitrust laws since it restrains lawful competition by the defendants. The point illustrates one of the many paradoxes of the Sherman Act, that it is sometimes necessary to restrict competition in order to preserve it. The elimination of three or four potential competitors from the general food industry can hardly be said to harm the public interest, and to what-

ever extent the defendants would be a significant competitive power in the field, the fears which gave birth to the decree are confirmed.

In its fundamentals, the case involves a giant complex of economic power that has been separated through the decree into its component corporations. Each component has been further dismembered by separation of those extensions of its tainted power which had reached into other areas of commerce. Swift was compelled to dispose of its substantial holdings in Libby, McNeill & Libby. Armour was forced to terminate its requirements arrangements with California Canneries. The grocery business was divorced from meat packing, and the two enterprises were exposed to independent competition. Having completed this divestiture, the petitioners now seek leave to re-combine, in part upon the ground that divestiture itself has eliminated the need. As vividly pointed out by counsel for *amici* in oral argument, the principle thus proposed would invite the Standard Oil trust, broken up by Standard Oil Co. of New Jersey v. United States, 1911, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, now to re-assemble.

In the typical case, it might be safe to presume that after forty years the object of the equity decree will have been achieved if it ever is to be. But this is not a case where equity intervened to correct a temporary dislocation or to afford a respite so that competition could be restored, and time alone is not a remedy. Here the defendants were huge and remained huge after the decree. They chose to retain size as meat packers rather than to risk further dismemberment, at the price of abandoning the opportunity to extend into other fields. The decree therefore operates as a restraint and a fetter to preserve the balance of competitive power. Its usefulness is not exhausted or outworn so long as the petitioners retain the economic might they attained through the combination.

To the extent that this hearing may be considered a trial within the meaning of Rule 52 of the Federal Rules of Civil Procedure, this memorandum shall stand as the court's findings of fact and conclusions of law.

The petitions are accordingly denied.